PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1800
_____

WAYNE LAND AND MINERAL GROUP LLC,
Appellant

v.

DELAWARE RIVER BASIN COMMISSION

MAYA VAN ROSSUM; DELAWARE RIVERKEEPER
NETWORK

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-16-cv-00897)
District Judge:  Hon. Robert D. Mariani
_____

Argued
November 7, 2017 and November 20, 2017

Before:   JORDAN, HARDIMAN and SCIRICA, *Circuit
Judges.*

(Filed: July 3, 2018)
_____

Jeffrey Belardi
Belardi Law Office
410 Spruce Street – 4th Fl.
Scranton, PA   18503

Christopher R. Nestor
Overstreet & Nestor
1425 Crooked Hill Road - #62066
Harrisburg, PA   17106

David R. Overstreet   [ARGUED]
Overstreet & Nestor
461 Cochran Rd.
P.O. Box 237
Pittsburgh, PA   15228

Joseph R. Rydzewski
Spall Rydzewski Anderson Lalley & Tunis
2573 Route 6
Hawley, PA   18428
        *Counsel for Appellant*

Mark L. Greenfogel
Kenneth J. Warren   [ARGUED]
Warren Environmental Counsel
975 Mill Road
Millridge Manor House Suite A
Bryn Mawr, PA   19010

        *Counsel for Appellee Delaware River Basin*
        *Commission*

2

Mark L. Freed
Jordan B. Yeager   [ARGUED]
Curtin & Heefner
2005 S. Easton Road – Ste. 100
Doylestown, PA   18901
       *Counsel for Intervenor-Defendant Appellees
       Maya Van Rossum and Delaware Riverkeeper Network*

Matthew H. Haverstick   [ARGUED]
Eric J. Schreiner
Joshua J. Voss
Kleinbard
1650 Market Street - 46th Fl.
Philadelphia, PA   19103
       *Counsel for Not Party Amicus Appellants*
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Wayne Land and Mineral Group, LLC, a company that wants to obtain natural gas by fracking reserves in Pennsylvania,[1] appeals from the dismissal of its complaint for

---

[1]  "Fracking," or hydraulic fracturing, is the process by which a mixture of water and various chemicals is injected into the ground at high pressure to cause the release of natural gas trapped in shale rock formations.  *See Fracking*, Merriam-Webster.com (last updated Mar. 29, 2018); *see also Hydraulic Fracturing*, McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003).

failure to state a claim. Wayne sought a ruling in the District Court under the Declaratory Judgment Act that an interstate compact does not give the Delaware River Basin Commission authority to review Wayne's proposed fracking activities. The Commission argued in response that Wayne's claim was properly dismissed as unripe, that Wayne lacks standing, that there has been no final agency action, and that Wayne has not exhausted available administrative remedies. The District Court rejected those arguments but nevertheless denied Wayne's request for relief and dismissed the case under Federal Rule of Civil Procedure 12(b)(6), after determining that Wayne's proposed activities constituted a "project" subject to the Commission's oversight, according to the unambiguous terms of the interstate compact. Because we conclude that the meaning of the word "project" as used in the compact is ambiguous, we will vacate the order of dismissal and remand the case for fact-finding on the intent of the compact's drafters.

## I.     BACKGROUND FACTS[2]

[2] The background facts are drawn from the parties' jointly-submitted appendices, Wayne's complaint, and any documents necessarily relied upon in that complaint. Additionally, some of the facts were derived from the District Court's evidentiary hearing. The jointly-submitted appendices include the interstate compact, which we cite extensively. Otherwise the joint appendices are only relied upon here to provide context.

4

**A.    The Delaware River Basin, the Interstate Compact, and the Delaware River Basin Commission**

The Delaware River Basin (the "Basin") is an area of land surrounding and draining into the Delaware River that extends through parts of Delaware, New Jersey, New York, and Pennsylvania (the "Basin States"). In 1961, the Basin States and the United States entered into the Delaware River Basin Compact (the "Compact"), which is an interstate agreement aimed at ensuring a unified approach to the conservation, utilization, development, management, and control of the water and related resources of the Basin.

The Compact created the Delaware River Basin Commission, comprising the Governors of the Basin States, as well as a commissioner appointed by the President of the United States. By its terms, it gives the Commission a broad range of powers to protect water quantity and quality within the Basin. Most relevant to this case are the Commission's general powers and duties, which are detailed in Article 3 of the Compact. Article 3 charges the Commission with creating "[a] comprehensive plan … for the immediate and long range development and uses of the water resources of the [B]asin[.]" (Joint App. at 366, § 3.2(a).) That plan must "include all public and private projects and facilities which are required, in the judgment of the [C]ommission, for the optimum planning, development, conservation, utilization, management and control of the water resources of the [B]asin to meet present and future needs[.]" (Joint App. at 386, § 13.1.)

Consistent with that planning responsibility, Article 3 gives the Commission the authority to review "projects"

5

undertaken in the Basin if they will have "a substantial effect on the water resources of the [B]asin[.]" (Joint App. at 370, § 3.8.) The Commission has the power to promulgate rules "for the procedure of submission, review and consideration of projects[.]" (Joint App. at 370, § 3.8.) More fully, the Compact states the criteria for that review process as follows:

> No project having a substantial effect on the water resources of the [B]asin shall hereafter be undertaken by any person, corporation or governmental authority unless it shall have been first submitted to and approved by the [C]ommission, subject to the provisions of Sections 3.3 and 3.5. The [C]ommission shall approve a project whenever it finds and determines that such project would not substantially impair or conflict with the comprehensive plan and may modify and approve as modified, or may disapprove any such project whenever it finds and determines that the project would substantially impair or conflict with such plan.

(Joint App. at 370, § 3.8.)

The Compact defines many of its key terms, including the word "project," which is said to be

> any work, service or activity which is separately planned, financed, or identified by the [C]ommission, or any separate facility undertaken or to be undertaken within a specified area, for the conservation, utilization, control,

6

> development or management of water resources which can be established and utilized independently or as an addition to an existing facility, and can be considered as a separate entity for purposes of evaluation[.]

(Joint App. at 363, § 1.2(g).) The Compact then defines "water resources" to include:

> water and related natural resources in, on, under, or above the ground, including related uses of land, which are subject to beneficial use, ownership or control.

(Joint App. at 363, § 1.2(i).) Finally, in sweeping language, the Compact defines "facility" as:

> any real or personal property, within or without the [B]asin, and improvements thereof or thereon, and any and all rights of way, water, water rights, plants, structures, machinery and equipment, acquired, constructed, operated or maintained for the beneficial use of water resources or related land uses including, without limiting the generality of the foregoing, any and all things and appurtenances necessary, useful or convenient for the control, collection, storage, withdrawal, diversion, release, treatment, transmission, sale or exchange of water; or for navigation thereon, or the development and use of hydroelectric energy and power, and public recreational facilities; or the propagation of fish and wildlife; or to conserve and protect the water

7

resources of the [B]asin or any existing or future water supply source, or to facilitate any other uses of any of them[.]

(Joint App. at 363, § 1.2(e).)

The Compact also gives the Commission power to address pollution within the Basin. Under Article 5 of the Compact, "[t]he [C]ommission may undertake investigations and surveys, and acquire, construct, operate and maintain projects and facilities to control potential pollution and abate or dilute existing pollution of the water resources of the [B]asin." (Joint App. at 372, § 5.1.) Article 5 provides the following:

The [C]ommission may assume jurisdiction to control future pollution and abate existing pollution in the waters of the [B]asin, whenever it determines after investigation and public hearing upon due notice that the effectuation of the comprehensive plan so requires. The standard of such control shall be that pollution by sewage or industrial or other waste originating within a signatory state shall not injuriously affect waters of the [B]asin as contemplated by the comprehensive plan. The [C]ommission, after such public hearing may classify the waters of the [B]asin and establish standards of treatment of sewage, industrial or other waste, according to such classes including allowance for the variable factors of surface and ground waters, such as size of the stream, flow, movement, location, character, self-purification,

8

and usage of the waters affected. After such investigation, notice and hearing the [C]ommission may adopt and from time to time amend and repeal rules, regulations and standards to control such future pollution and abate existing pollution, and to require such treatment of sewage, industrial or other waste within a time reasonable for the construction of the necessary works, as may be required to protect the public health or to preserve the waters of the [B]asin for uses in accordance with the comprehensive plan.

(Joint App. at 372, § 5.2.)

It is plain that the Commission has broad rulemaking and enforcement powers. Under Article 14 of the Compact, the Commission may "[m]ake and enforce reasonable rules and regulations for the effectuation, application and enforcement of this [C]ompact[.]" (Joint App. at 389, § 14.2(a).)

## B.     Natural Gas Fracking and the Moratorium

Natural gas reserves underlie at least some of the land within the Basin. To extract natural gas from shale rock formations, energy companies use a combination of horizontal drilling and hydraulic fracturing. From an area on the ground called a well pad, companies employ fracking technology to inject a fluid composed of water and various chemicals into the ground to force the release of trapped gas. It is estimated that the fracking process may require up to five million gallons of water per well. Some of the water in the fracking fluid is consumed and will remain underground, while the rest will

9

flow back to the surface where it is recovered and either disposed of or recycled.

The extraction and sale of natural gas may be profitable for those involved, and it certainly provides benefits to energy consumers, but fracking is not without controversy – in particular, concerns that it may adversely affect the quality and quantity of water resources. As a result, the Commission has asserted authority over fracking-related activities in the Basin.

In 2009, the then-Executive Director of the Commission, Carol Collier, issued a moratorium banning most natural gas fracking projects located "within the drainage area of Special Protection Waters," unless there was prior Commission approval.[3] (Joint App. at 98.) Collier began by explaining that fracking had grown in the Basin due to technological advances, and that those natural gas projects involved a number of activities that, "if not properly performed[,] may cause adverse environmental effects, including effects on water resources."[4] (Joint App. at 97.)

---

[3] The "Special Protection Waters," which are subject to a regulatory program created by the Commission, are defined as the non-tidal part of the Basin, which is all of the Basin north of Trenton, New Jersey.

[4] Some of the activities cited include:

construction of a well pad and associated roadways …, the drilling of a well bore …, the withdrawal and transport of surface or ground water, the injection of the water and chemical fracturing mixtures into the wells to release the

10

The initial 2009 moratorium covered projects that included a "drilling pad upon which a well intended for eventual production is located, all appurtenant facilities and activities related thereto and all locations of water withdrawals used or to be used to supply water to the project." (Joint App. at 98.) But, at that time, "[w]ells intended solely for exploratory purposes" were not covered by the moratorium. (Joint App. at 98.)

Collier expanded that moratorium in 2010 in a supplemental notice letter. She withdrew the exclusion for exploratory wells and stated that "all natural gas well project sponsors, including the sponsors of natural gas well projects intended solely for exploratory purposes, … may not commence any natural gas well project for the production from or exploration of shale formations within the drainage area of Special Protection Waters without first" obtaining the approval of the Commission. (Joint App. at 113 (emphasis omitted).) Collier said that the inclusion of exploratory wells in the moratorium would "support the Commission's goal that exploratory wells do not serve as a source of degradation of the Commission's Special Protection Waters," by "remov[ing] any regulatory incentive" to engage in purportedly "exploratory"

---

> trapped gas, the recovery and storage of recovered fracturing fluid, water and associated leached constituents extracted with the gas, the storage and potentially the reuse of the recovered wastewater and chemicals and the eventual disposal of the water and chemicals.

(Joint App. at 97.)

drilling before the Commission could implement final natural gas regulations. (Joint App. at 113.)

Since then, the Commission has not issued any final regulations with respect to the procedures and rules governing the review of fracking projects.[5]

---

[5] The Commission released proposed fracking regulations at the end of 2010, received about 69,000 comments on those proposed regulations, and released revised draft regulations in 2011. But the Commission never made a final decision with respect to those draft regulations. The Commission adopted a resolution in September 2017 instructing its Executive Director to publish new proposed natural gas fracking regulations by November 30, 2017, which were published on that final day. *See* Proposed New 18 C.F.R. Part 440, Hydraulic Fracturing in Shale and Other Formations, http://www.state.nj.us/drbc/library/documents/HydraulicFract uring/18CFR440_HydraulicFracturing_draft-for-comment_113017.pdf. The public comment period closed on March 30, 2018, and if the final regulations track the proposed regulations without change, "[h]igh volume hydraulic fracturing in hydrocarbon bearing rock formations [will be] prohibited within the Delaware River Basin." Administrative Manual and Special Regulations Regarding Natural Gas Development Activities; Additional Clarifying Amendments, 83 Fed. Reg. 1586, 1595 (proposed Jan. 12, 2018) (to be codified at 18 C.F.R. pt. 440).

Nevertheless, the parties in this case agree that those proposed regulations do not prevent us from deciding Wayne's claim. Wayne contends that, unless the Commission is prepared to no longer assert project review authority over fracking projects within the Basin under § 3.8 of the Compact,

### C.    Wayne

Wayne Land and Mineral Group, LLC is a Pennsylvania company that alleges it has been particularly harmed by the Commission's moratorium on fracking.  It owns about 180 acres of land in Wayne County, Pennsylvania, and roughly 75 acres of that land are located within the Basin.  That is the portion of Wayne's property that contains shale formations with natural gas reserves.  Wayne wants to build a natural gas well pad and related infrastructure on its property, drill an exploratory well targeting the recoverable natural gas in the shale, and if viable, drill a horizontal well and use fracking to extract gas for sale.  Wayne contends that the Commission's moratorium is wrongly impeding its investment-backed expectations.

## II.    PROCEDURAL HISTORY

---

the proposed regulations have "no bearing on [Wayne's] narrowly-tailored claim."  (Wayne's Fed. R. App. P. 28(j) Letter, dated Oct. 18, 2017, at 4.)  The Commission contends that the proposed regulations have "no direct effect on the issues raised in this appeal" because the Commission has "not purport[ed] to make a final decision on any issues" and its "authority to issue regulations under the Compact is not dependent on its Section 3.8 (project review) authority[.]" (Commission's Fed. R. App. P. 28(j) Letter, dated Oct. 18, 2017, at 2.)  The Delaware Riverkeeper Network also stated that the Commission's "initiation of rulemaking does not affect the issues presented in this appeal."  (Delaware Riverkeeper Network's Fed. R. App. P. 28(j) Letter, dated Oct. 18, 2017, at 2.)

### A. The Complaint, the Motion to Dismiss, and the Motions for Intervention

Wayne filed suit against the Commission in the United States District Court for the Middle District of Pennsylvania. In its complaint, it said that the Commission lacks the authority under the Compact "to review and approve a natural gas well pad, a gas well and related facilities and associated activities on [Wayne's] property" within the Basin. (Joint App. at 62.) More particularly, Wayne alleged that the Commission overstepped its bounds by interpreting its power to review "projects" to include essentially "any activity, development or other human undertaking in the Basin that uses water[.]" (Joint App. at 63-64.) Wayne sought a declaratory judgment from the District Court that the Commission's jurisdiction extends only to matters fitting the Compact's definition of "project" and that the activities proposed by Wayne do "not constitute a 'project' under Section 3.8 of the Compact." (Joint App. at 77-78.) By Wayne's reckoning, then, whether its activities "may have a substantial effect on water resources in the Basin" is irrelevant because those activities are not a "project" subject to the Commission's authority. (Joint App. at 77.)

The Commission responded by filing a motion to dismiss Wayne's complaint. It asserted that the District Court lacked subject matter jurisdiction under Rule 12(b)(1) because Wayne's claim was not ripe and Wayne lacked standing. It also said, in the alternative, that the District Court should dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief may be granted because there was no final agency action and Wayne did not exhaust available administrative remedies. The Commission did not, however, make arguments countering Wayne's reading of the Compact's

14

text, including Wayne's assertion about the scope of the term "project."

The Delaware Riverkeeper Network and an individual named Maya K. van Rossum, who identifies herself as "the Delaware Riverkeeper," were granted permission by the District Court to intervene as defendants. The Court denied motions to intervene from Pennsylvania State Senators Joseph B. Scarnati, Lisa Baker, and Gene Yaw, as well as from Damascus Citizens for Sustainability, Inc. The Delaware Riverkeeper Network and Ms. van Rossum submitted a brief in support of the Commission's motion to dismiss Wayne's complaint, focusing largely on the terms of the Compact and the Commission's authority to review fracking activities as "projects" under that Compact.

### B. The District Court's Hearing

At Wayne's request, the District Court held an evidentiary hearing and heard oral argument on the Commission's motion to dismiss. The new Executive Director of the Commission, Steven Tambini, appeared and testified that the Commission had not yet adopted final rules regarding fracking activities in the Basin but that the Commission would be willing to make "a jurisdictional determination … with respect to natural gas activity" if one were sought. (Joint App. at 180.) Tambini confirmed that, because the Commission had not made a jurisdictional statement, there was no "final decision" as to whether Wayne's "activities may have a substantial effect on the water resources of the [B]asin[.]" (Joint App. at 181.) Until it made such a statement, Tambini claimed, the Commission could not be said to have made any "final determination" about whether it has "authority over

15

natural gas exploration and … production activities at a well pad site" under § 3.8 of the Compact. (Joint App. at 180-81.) According to Tambini, such a jurisdictional determination would typically include an assessment of whether the applicant's activities are a project and, if so, whether that project will have a substantial effect on the water resources in the Basin. He further testified that Wayne had not filed a request for a jurisdictional determination, and that Wayne had "not asked to come in to visit with us, did not ask professionals to visit with us, [and] did not ask the commissioners" whether it had to submit its proposed fracking plans to the Commission for project review. (Joint App. at 155.) But Tambini also admitted that no one has ever sought a jurisdictional determination from the Commission regarding natural gas extraction.

Tambini's testimony made plain the legal risks the Commission can impose on energy companies. He said that a company could be fined "not less than $90,000" if it failed to submit an application to the Commission before drilling a natural gas fracking well. (Joint App. at 212, 215-16.) And he agreed that, "if you were going to drill a well, construct a well pad, you had to file with the [C]ommission." (Joint App. at 216.) That was his understanding of the intent behind the 2009 and 2010 moratoriums.

His testimony also showed that the process for obtaining a jurisdictional determination, or even discovering the existence of that option, was hardly transparent. He said:

> If you went to the website, I will be the first to admit there's no application for jurisdictional determination. But if you['d] like to have a

16

meeting, have a conference, write a letter, write me an e-mail, whatever you want to do to get this started on jurisdictional determination, the [C]ommission has indicated that we will make a jurisdictional determination.

(Joint App. at 227.)  Tambini stated that if the Commission has "information on the activities, the full scope of the [proposed drilling] activities, then the commissioners can make a jurisdictional determination."  (Joint App. at 228.)  He indicated that, at a minimum, an applicant must show "where the water is coming from, how much water is being used, how many wells, how many wells by when[,] … how much [water] will stay in the formation, how much will be returned, when it does return, what is the water quality, how is it being stored, potentially how it's being treated, [and] where it's discharged," among other things.  (Joint App. at 228.)

## C.    The Dismissal of the Complaint

The District Court denied the Commission's motion to dismiss Wayne's complaint for lack of subject matter jurisdiction.  Specifically, it determined that Wayne had standing because it adequately alleged that the Commission's assertion of jurisdiction over fracking activities within the Basin had caused it economic injury.  Furthermore, the Court concluded that Wayne's claim was ripe because it sought a declaratory judgment and, in the absence of relief, Wayne faced a serious threat of fines for noncompliance.

The District Court also rejected the Commission's arguments in support of its motion to dismiss for failure to state a claim.  The Court was unpersuaded that the supposed lack of

17

final agency action was a problem, given that Wayne was seeking a declaratory judgment rather than judicial review of any specific action by the Commission. As for the Commission's argument that Wayne failed to exhaust administrative remedies, the District Court noted that declaratory judgments are available even when a plaintiff has other remedies. Nevertheless, the Court decided *sua sponte* to dismiss the complaint for failure to state a claim because, on the merits, the Court determined the Compact's definition of "project" plainly and unambiguously included Wayne's proposed fracking activities.

The Court gave two primary reasons for that conclusion. First, it stated that Wayne's complaint alleged that Wayne would use water to carry out natural gas drilling activities on its property located within the Basin. Second, the Court said that reading the definition of "project" in light of the Compact's definition of "water resources" conclusively resolved the matter because the definition of "water resources" includes any "related uses of land," which the Court believed clearly encompassed Wayne's proposed fracking activities.

**D.     Appeal**

Wayne timely appealed, and the parties have thoroughly briefed their positions.[6] Reflecting the substantial public

---

[6]     The Commission, the Delaware Riverkeeper Network, and Ms. van Rossum are the respondents, and they assert that we should affirm the District Court's judgment. Although Wayne contends that the Delaware Riverkeeper Network and the Delaware Riverkeeper cannot participate in this appeal, courts have held that "[w]hen a party intervenes, it

interest in this case, amicus briefs have been submitted by four Pennsylvania senators and thirty Pennsylvania representatives, as well as by Damascus Citizens for Sustainability, Inc. The state senators and representatives argue that the District Court's determination that the word "project" in the Compact encompasses fracking-related activities permits the Commission to usurp the legislative authority that the Pennsylvania Constitution vests exclusively in the Pennsylvania General Assembly.[7] Damascus Citizens for Sustainability, Inc. argues in its brief that the Commission's jurisdiction over fracking and the moratorium it placed on fracking are the only things preventing the negative effects allegedly associated with fracking activity.[8]

## III. DISCUSSION

Wayne argues that we must vacate the order dismissing its complaint because the District Court improperly ruled *sua sponte* on the merits, without providing Wayne notice and an opportunity to be heard, and because the Compact's text unambiguously does not cover fracking-related activities. The Commission, the Delaware Riverkeeper Network, and Ms. van

---

becomes a full participant in the lawsuit and is treated just as if it were an original party." *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985).

[7] We denied a request from the Pennsylvania senators and representatives to intervene as appellants, but we granted their request to participate in oral argument.

[8] We are grateful for the additional insights and concerns expressed by the amici.

19

Rossum collectively counter that we should affirm the order of dismissal either because we lack jurisdiction to hear Wayne's claim, because Wayne has not stated a claim to relief, or because we should agree with the District Court's interpretation of the Compact's text as covering Wayne's proposed activities. Because we conclude that the District Court rightly decided it had jurisdiction but wrongly decided that the Compact's text unambiguously covers Wayne's proposed activities, we will vacate the order dismissing Wayne's complaint and remand the case for additional fact-finding on the intent of the Compact's drafters.

## A.    Jurisdiction, Finality, and Exhaustion

Wayne cites 28 U.S.C. § 1331 and the terms of the Compact as the basis of the District Court's jurisdiction, and 28 U.S.C. § 1291 as our jurisdictional basis. The Commission, however, contends that we do not have jurisdiction to entertain Wayne's claim because it is not ripe and Wayne lacks standing. The District Court rejected those same arguments and asserted jurisdiction over the case.[9]  "We review *de novo* the District

---

[9] The Commission did not file a cross-appeal, but "[w]e have previously said that an appellee may, without taking a cross-appeal, support the judgment as entered through any matter appearing in the record[.]" *In re Christopher Columbus, LLC*, 872 F.3d 130, 133 n.5 (3d Cir. 2017) (internal quotation marks and citation omitted).  Additionally, subject matter jurisdiction may be contested at any time. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).  Moreover, federal courts have an independent obligation to assure themselves of their own jurisdiction. *In re Klaas*, 858 F.3d

Court's determination of jurisdiction[.]" *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 488 n.9 (3d Cir. 2017).

### 1. Ripeness

Our jurisdiction extends only to claims that are ripe for resolution. *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003). The Commission argues that Wayne's claim is not ripe because Wayne has not requested a jurisdictional determination from the Commission and there is thus no legally cognizable harm. In the Commission's view, Wayne has chosen not to proceed with its fracking project, instead of asking the Commission whether that project requires Commission approval. Wayne counters that the burden of obtaining a jurisdictional determination is itself a harm that Wayne can contest by seeking declaratory relief.

"The function of the ripeness doctrine is to determine whether a party has brought an action prematurely, and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Id.* (citation omitted). The Supreme Court has stated that a claim is ripe for review if it is fit for judicial decision and withholding court consideration of the issue would constitute a hardship to the parties. *Id.* at 434 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

---

820, 825 (3d Cir. 2017). Thus, we can and must address the Commission's jurisdictional arguments.

"The contours of the ripeness doctrine are particularly difficult to define with precision when a party seeks a declaratory judgment." *Marathon Petroleum Corp.*, 876 F.3d at 496 (alteration, internal quotation marks, and citation omitted). Yet we have stated that we are guided by three main considerations: the adversity of the parties' interests, the conclusiveness of the judgment, and the practical utility of that judgment. *Id.* Applying those factors here, we agree with the District Court that Wayne's claim is ripe.

First, there is an adversity of legal interests. Adversity is assessed by asking "[w]hether the claim involves uncertain and contingent events, or presents a real and substantial threat of harm." *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006) (citation omitted). "It is not necessary for the party seeking review to have suffered a completed harm in order to establish adversity of interest so long as there is a substantial threat of real harm that remains throughout the course of the litigation." *Id.* Here, Wayne faces a real and substantial threat of harm. If Wayne must seek a jurisdictional determination or submit materials for project review – a process that, as Tambini testified, at a minimum requires showing "where the water is coming from, how much water is being used, how many wells, how many wells by when[,] … how much [water] will stay in the formation, how much will be returned, when it does return, what is the water quality, how is it being stored, potentially how it's being treated, [and] where it's discharged," among other things, (Joint App. at 228) – it will necessarily incur significant expenses and legal risk in attempting to meet that burden. But if Wayne forgoes submitting anything to the Commission, it may well face substantial fines. The Commission previously fined another company $90,000 for

22

commencing natural gas drilling activities in the Basin without the Commission's prior review and approval.

Second, Wayne's claim presents sufficiently concrete facts to allow for a conclusive legal judgment. A claim is fit for adjudication if a "declaratory judgment would in fact determine the parties' rights, as distinguished from an advisory opinion based on a hypothetical set of facts." *Surrick*, 449 F.3d at 528. "Cases presenting predominately legal questions are particularly amenable to a conclusive determination in a preenforcement context, and generally require less factual development." *Id.* (internal quotation marks and citation omitted). Here, Wayne's complaint presents an important legal question, which is whether constructing a well pad, drilling an exploratory well, and commencing fracking constitutes a "project" subject to the Commission's project review authority under the Compact. Wayne's claim turns on the proper interpretation of the Compact's terms. There does need to be some factual development in this case, as we explain in more detail herein, but granting or denying Wayne's requested declaratory relief will conclusively determine whether Wayne can forego the expense of applying to the Commission, either for a jurisdictional determination or for approval of its project.

The Commission cites an opinion by the United States Court of Appeals for the District of Columbia Circuit for the contention that a declaratory judgment here would not be conclusive but instead would lead to piecemeal litigation. In *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission*, the plaintiff challenged an investigating agency's tentative assertion that automatic sprinkler heads manufactured by the plaintiff were "consumer products" within the meaning

23

of a federal statute and thus subject to the agency's regulatory jurisdiction. 324 F.3d 726, 729-30 (D.C. Cir. 2003). The plaintiff sought a declaratory judgment to that effect. *Id.* at 730. It argued that its declaratory judgment claim was sufficiently ripe for decision because it was challenging "the agency's statutory authority to regulate, rather than … the substance" of the agency's letter determination. *Id.* at 731. The D.C. Circuit rejected that argument and held that the agency's actions were not yet subject to review because the agency had not taken any final action. *Id.* at 731-32. The court reasoned that "the agency has not yet made any determination or issued any order imposing any obligation on [the plaintiff], denying any right of [the plaintiff], or fixing any legal relationship." *Id.* at 732. According to the court, the plaintiff still had the opportunity to convince the agency that the term "consumer product" did not include its automatic sprinkler heads, which would strip the agency of jurisdiction. *Id.* at 732-33. As the court saw it, allowing the plaintiff's claim to move forward at that time would have produced piecemeal litigation over the agency's jurisdiction and other points of appeal. *Id.* at 733.

That decision is distinguishable. Whereas the agency in *Reliable* had not yet made a final decision about its regulatory jurisdiction, the Commission here has taken a definitive position that it has authority to review "well pads, exploratory wells, hydraulic fracturing and related activities" under the Compact. (Joint App. at 37 n.14.) That the Commission has thus asserted its jurisdiction is a finding of fact by the District Court based on the clear language of Collier's 2009 and 2010 executive letters, and the finding is well founded. Furthermore, unlike the agency in *Reliable*, which merely requested voluntary compliance from the plaintiff without

24

threatening sanctions, Tambini's testimony indicates that the Commission has taken the position that anyone planning construction of facilities associated with fracking must submit an application to the Commission or face the threat of substantial fines. And while it is generally preferable to resolve a case all at once, the possibility that the Commission may be upheld in asserting jurisdiction and that this case may have a second phase does not outweigh Wayne's competing interest in a declaration of its rights. On the issue before us, Wayne's claim allows for a conclusive legal judgment.

Third and finally, a ruling on Wayne's request for declaratory relief would have particular utility. A judgment "will affect the parties' plans of actions by alleviating legal uncertainty." *Surrick*, 449 F.3d at 529. In the context of the Declaratory Judgment Act, utility exists when the judgment would "materially affect the parties and serve … [to] clarify[] legal relationships so that plaintiffs … [can] make responsible decisions about the future." *Id.* (last ellipses and last alteration in original) (internal quotation marks and citation omitted). Here, a grant or denial of the relief Wayne requests would clarify the legal relationship between Wayne (and other similarly situated natural gas companies) and the Commission so that fracking firms can operate with a better understanding of their legal constraints.

Based on those considerations of adversity, conclusiveness, and utility, Wayne's claim is ripe for judicial review.

2.    Standing

25

In addition to having a ripe claim, a plaintiff must also have standing to invoke the jurisdiction of the federal courts under Article III of the United States Constitution. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As with ripeness, the test for standing has three elements. *Id.* First, the plaintiff must have suffered an injury in fact. *Id.* That requires "an invasion of a legally protected interest" which is "concrete and particularized" and "actual or imminent," rather than "conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted). Second, there must be a causal link between the injury and the allegedly improper conduct. *Id.* "[T]he injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *Id.* (all alterations but the first in original). Third, it must be likely that the injury will be redressed by a favorable decision. *Id.* at 561. "The party invoking federal jurisdiction bears the burden of establishing [those three] elements." *Id.*

Here, Wayne has met that burden. It has shown concrete and particularized injury because the Commission's assertion of jurisdiction over well pad construction, exploratory well drilling, and fracking activities has prevented Wayne from realizing the market value of natural resources on its property, has caused Wayne to face a threat of sanctions, and has confronted Wayne with an extensive and expensive application process. The Commission's assertion of jurisdiction over and imposition of a moratorium on Wayne's activities is the cause of those injuries because it prevents Wayne from fracking on its property. And a decision in Wayne's favor would redress the alleged injury by removing, at least as to Wayne, the moratorium on fracking in the Basin. For those reasons, we are satisfied that Wayne has standing.

3.    Final Agency Action and Exhaustion of
      Administrative Remedies

There is a strong presumption that judicial review of an agency action is only available after that action becomes final, *Bell v. New Jersey*, 461 U.S. 773, 778 (1983), and the Commission thus contends that this suit should be dismissed because it has not made a final decision about Wayne's proposed activities.[10]   Most of the decisions bearing on the reviewability of agency actions are, unsurprisingly, from cases in which the Administrative Procedure Act ("APA") was the controlling law. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (stating two requirements for concluding that an agency action is final, including that "the action must mark the 'consummation' of the agency's decisionmaking process," which means "it must not be of a merely tentative or interlocutory nature[,]" and "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow …'" (citation omitted)).   By its terms, however, the Compact is not subject to the APA.  (*See* Joint App. at 400, § 15.1(m) (stating that the Commission is

---

[10] Sometimes the "final agency action" requirement has been couched in terms of jurisdiction.  *See, e.g.*, *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 247 (3d Cir. 2011).  But we have noted that that is "too loose a use of that term." *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 125 n.11 (2012).  The federal question statute, 28 U.S.C. § 1331, provides federal courts with jurisdiction to review agency actions. *Id.*  The "final agency action" requirement, instead, goes to whether there is a cause of action under the statute that provides for judicial review of a given agency determination. *Id.*

not a federal agency for purposes of the APA)).  How to approach the issue of final agency action without relying on legal precedents developed under the APA is an interesting question but, fortunately, one we do not need to address, because the question Wayne poses is not really one of administrative law at all.

Wayne is not asking for a review of an agency's action.  Wayne's complaint does not seek to invalidate Collier's letters placing a moratorium on fracking activities in the Basin.  Instead, Wayne seeks "a declaratory judgment that its proposed activities do not constitute a 'project' subject to [the Commission's] project review under Section 3.8 of the Compact." (Joint App. at 40.)  Even though the APA, which requires final agency action to invoke judicial review, *see* 5 U.S.C. § 704, does not apply, the Commission would have us invoke the final agency action requirement because § 3.8 says that "[a]ny determination of the [C]ommission [under § 3.8] shall be subject to judicial review in any court of competent jurisdiction." (Joint App. at 370.)  The Commission reads that to mean that *until* it has made a determination, there is no judicial review available.  Of course, that language can also be read as meaning simply that courts can review determinations about projects, not that they can review only such determinations.  Other kinds of disputes are possible, and this is one.  Our jurisdiction is an extension of the District Court's and is derived from § 15.1(p) of the Compact, which states that "[t]he United States district courts shall have original jurisdiction of all cases or controversies arising under the Compact[.]" (Joint App. at 401.)  Wayne's claim presents a case or controversy arising under the Compact, for the reasons already stated.  As more fully discussed herein, we are dealing with what is, in essence, contract interpretation.  Thus, we

conclude that the "final agency action" requirement of administrative law is not applicable and does not determine our ability to review this case.

The Commission also invokes the doctrine of exhaustion of administrative remedies in its effort to block this suit. While related to the finality requirement, exhaustion is conceptually distinct. *Darby v. Cisneros*, 509 U.S. 137, 144 (1993). As just noted, however, we are dealing with interpretation of the Compact itself, not a question of administrative law, so exhaustion, like finality, is not an operative principle.[11] For those reasons, we agree with the

---

[11] Even if we were to consider administrative law principles, we do not think an adequate process existed to which an exhaustion requirement might attach. The Commission contends that Wayne failed to seek a jurisdictional determination before bringing this lawsuit. Tambini testified, however, that no one has ever sought a jurisdictional determination from the Commission, that there are no published or established procedures for obtaining a jurisdictional determination, and that the only way to obtain one is by submitting something – what that might be is wholly unclear – in writing to the Executive Director of the Commission. We would be hard-pressed to demand that regulated parties exhaust administrative procedures that are either unknown or so vague as to be unknowable. Just because the Commission now declares that it "is committed to making a jurisdictional determination within ninety days of [Wayne's] submission of a request with supporting details of its planned activities and facilities" does not mean Wayne has suddenly failed to exhaust available administrative remedies. (Answering Br. at 31.) There are no established remedies, and

District Court's refusal to dismiss Wayne's claim based on an alleged failure to exhaust administrative remedies. Seeing no impediment to our responsibility to exercise jurisdiction, we proceed to the merits.

### B. The Merits

Wayne argues that the District Court erred by dismissing its complaint for failure to state a claim.[12] We review that decision *de novo* under Federal Rule of Civil Procedure 12(b)(6). *Marathon Petroleum Corp.*, 876 F.3d at 488 n.9. "When considering a Rule 12(b)(6) motion, we 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017) (citation omitted). We may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Hartig Drug Co. Inc. v. Senju*

---

we are not interrupting any "administrative process" by hearing Wayne's claim now.

[12] Wayne also argues that the District Court erred by deciding *sua sponte* to reach the merits of its claim because the District Court did not provide Wayne notice or an opportunity to be heard before dismissing its complaint on those grounds. We do not need to decide that issue because, following full merits briefing on appeal and plenary review of the matter decided below, we will vacate the District Court's judgment and remand for further proceedings on the merits.

30

*Pharm. Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

The District Court concluded that it was apparent from the face of Wayne's complaint that its proposed activities constituted a "project" subject to the Commission's project review authority under § 3.8 of the Compact. The Court determined that the text of the Compact, especially its definitions of "project," "facility," and "water resources," can be read only one way and plainly encompass Wayne's proposed activities. Wayne argues that the District Court erred because the Compact plainly excludes its proposed fracking-related activities from the scope of the Commission's project review authority, or at the very least, because the Compact is ambiguous on that point. The Commission counters that "the District Court correctly dismissed [Wayne's complaint] because the well pad and high volume hydraulic fracturing as customarily performed in the oil and gas industry clearly comprise a project." (Answering Br. at 32.) We conclude that the text of the Compact is ambiguous and, consequently, that a decision on the merits was premature.

1.      Principles of Interpretation for Interstate Compacts

The United States Constitution requires that interstate compacts be approved by Congress. U.S. Const. art. I, § 10, cl. 3. Such approval transforms compacts into federal law. *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 620 (2013). Nonetheless, "[i]nterstate compacts are construed as contracts under the principles of contract law." *Id.* at 628. As with any contract, the analysis begins with "the express terms of the Compact as the best indication of the intent of the

31

parties[.]" *Id.* But, if the text of the Compact is ambiguous, we must then "turn to other interpretive tools to shed light on the intent of the Compact's drafters." *Id.* at 631. One of those interpretative tools is the background notion "that States do not easily cede their sovereign powers, including their control over waters within their own territories[.]" *Id.* Other guideposts include the treatment of similar issues in other interstate water compacts, the parties' course of performance under the Compact, and the negotiation and legislative history of the Compact. *Id.*; *Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991).

## 2. Standard of Review for the District Court's Merits Determination

Since we construe the Compact using traditional contract principles, that must also inform the standard of review we apply to the District Court's reading of the Compact. Typically, our review of a lower court's understanding of congressional legislation is plenary because it is a matter of statutory interpretation. *Susinno v. Work Out World Inc.*, 862 F.3d 346, 348 (3d Cir. 2017). That includes both an analysis of the statute's plain meaning and sometimes, to the extent the statute is ambiguous, a review of extrinsic evidence of Congressional intent. *United States v. Williams*, 675 F.3d 275, 277-78 (3d Cir. 2012). But the Supreme Court has made clear that we are not conducting statutory interpretation when analyzing the terms of a compact – again, such "compacts are construed as contracts under the principles of contract law." *Tarrant*, 569 U.S. at 628. Contract principles suggest that our standard of review is different than that applicable to statutory interpretation.

32

Under our case law, contract interpretation is a question of fact reviewed for clear error and contract construction is a question of law reviewed *de novo*.[13] *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 229 (3d Cir. 2007). We have explained that, for purposes of contract interpretation, "[i]f the contract as a whole is susceptible to more than one

---

[13] "The distinction between interpretation and construction is not always easy." *John F. Harkins Co., Inc. v. Waldinger Corp.*, 796 F.2d 657, 659 (3d Cir. 1986). We have previously turned to Professor Corbin for guidance on how to describe the distinction:

> By "interpretation of language" we determine what ideas that language induces in other persons. By "construction of the contract," as that term will be used here, we determine its legal operation—its effect upon the action of courts and administrative officials. If we make this distinction, then the construction of a contract starts with the interpretation of its language but does not end with it; while the process of interpretation stops wholly short of a determination of the legal relations of the parties. When a court gives a construction to the contract as that is affected by events subsequent to its making and not foreseen by the parties, it is departing very far from mere interpretation of their symbols of expression, although even then it may claim somewhat erroneously to be giving effect to the "intention" of the parties.

*Id.* (quoting 3 Corbin, Corbin on Contracts § 534 (1960)).

reading, the fact finder resolves the matter, but if it is unambiguous and can be interpreted only one way, the court interprets the contract as a matter of law." *Allied Erecting & Dismantling, Co., Inc. v. USX Corp.*, 249 F.3d 191, 201 (3d Cir. 2001) (internal quotation marks and citation omitted).

Thus, our analysis proceeds in the alternative. To begin, we review *de novo* the text of the Compact to determine whether we agree with the District Court that it is unambiguous. Next, if we agree that the text is unambiguous, then we also review *de novo* whether Wayne's proposed activities on the face of the complaint fall within the scope of the Compact's text. If, on the other hand, our review of the text of the Compact leads us to conclude that it is ambiguous, then we review for clear error the District Court's findings regarding the intent of the parties in crafting that text.

We turn to that analysis using the contract principles and interpretive tools endorsed by the Supreme Court.

### 3. Whether the Compact is Ambiguous

In interpreting the terms of the Compact, the first step is to clearly define the issue in dispute. Wayne asked in its complaint for a declaration "that the Commission does not have jurisdiction over, or the authority to review and approve, or to require [Wayne] to seek prior approval from the Commission for, or to otherwise preclude the development of, [Wayne's] proposed well pad, appurtenant facilities or the related activities to be carried out on the [p]roperty."[14] (Joint

---

[14] Wayne's complaint defines "Well Pads" as "natural gas well pads, all appurtenant facilities, and related activities

34

App. at 79.)   In other words, Wayne framed the issue as whether the Compact's definition of "project" encompasses its proposed well pad and related activities.   We interpret the Compact with respect to only the facts stated on the face of the complaint.

The Compact itself tells us that its provisions are to be "reasonably and liberally construed."   (Joint App. at 396, § 14.21.)   In keeping with that, we've said "[t]he signatory governments [of the Compact] granted broad powers to the Commission, thereby offering the agency 'a realistic opportunity to effectuate a comprehensive plan that concerned itself with water quality as well as water supply, hydroelectric power, recreational areas, wildlife conservation, and flood protection." *Del. River Basin Comm'n v. Bucks Cty. Water & Sewer Auth.*, 641 F.2d 1087, 1089 n.3 (3d Cir. 1981) (citation omitted).   But breadth does not equal clarity, at least not with respect to the issue here.

Interpreting the Compact according to its language and in light of Wayne's proposed activities, the term "project" is ambiguous for three reasons.   First, the District Court's interpretation of the term "project" may read the word "for" out of the Compact and may give the Commission more power than the drafters intended.   Second, although combining the definitions of "project" and "water resources" as the District Court did may not be unreasonable, it does not resolve the ambiguity.   Finally, interpreting "project" in light of the Compact as a whole, the broad reading adopted by the District

---

carried out in connection with gas wells targeting shale formations in the Basin[.]"  (Joint App. at 68.)

Court may be at odds with the use of that term in other provisions. We discuss each of those reasons in turn.

i. *The Compact's Definition of "Project"*

Reasonable arguments can be and have been made both in support of and against the District Court's conclusion that the word "project" includes Wayne's proposed activities.[15] That suggests that the word "project," as used in the Compact, is ambiguous. The dispute over the Compact's definition of "project" centers primarily on the word "for." As a reminder, the Compact defines a "project" as:

> any work, service or activity which is separately planned, financed, or identified by the [C]ommission, or any separate facility undertaken or to be undertaken within a specified area, *for* the conservation, utilization, control, development or management of water resources which can be established and utilized independently or as an addition to an existing facility, and can be considered as a separate entity for purposes of evaluation[.]

---

[15] Throughout the remainder of this opinion, when we use the word "reasonable" to describe a given interpretation, we mean "potentially reasonable" or "conceivably correct." As discussed further herein, additional information regarding the intent of the Compact's drafters may alter one's view of whether a particular interpretation is truly one that the Compact can bear.

(Joint App. at 363, § 1.2(g) (emphasis added).) The word "for" is commonly "used as a function word to indicate purpose" or "an intended goal." *For*, Merriam-Webster's Collegiate Dictionary (10th ed. 2002).

Wayne argues that its fracking-related activities are not "*for* the … utilization … of water resources" and, if considered to be "facilities," as defined in the Compact, are not facilities "*undertaken … for* the … utilization … of water resources[.]" (Joint App. at 363, § 1.2(g) (emphasis added).) Wayne asserts that it does not propose to frack for the purpose or intended goal of using water, but rather for the purpose and goal of capturing natural gas. Water just happens to be used in that process. From Wayne's perspective, the Commission's and the District Court's interpretation of "project" reads the word "for" out of the definition and replaces it with the phrase "that involves." Essentially, Wayne frames the Commission's and the District Court's interpretation as extending "project" to cover "any … activity … identified by the [C]ommission, or any separate facility undertaken …, [that involves] water resources[.]" (Joint App. at 363, § 1.2(g).)[16]

---

[16] The focus of our analysis is on the word "utilization" because that appears to be most directly connected to Wayne's activities, but the Commission points out that "management" of water resources could also cover fracking because fracking involves management of wastewater and storage of needed water and chemicals before their use. While that is likely true, it runs into the same issues Wayne identifies with respect to "utilization" of water resources, namely that we cannot ignore that fracking is not for the purpose of managing water resources. Thus, that distinction does not alter our analysis or conclusion.

37

That has some persuasive force. No matter how "reasonably and liberally" we construe The Compact's terms (Joint App. at 396, § 14.21), we cannot ignore that the word "for" must have some purposive meaning and limiting function. Doing so would sweep nearly any activity that happens to use Basin water into the Compact's definition of "project," which could potentially include the construction of a new skyscraper in New York City or a small housing development in rural Pennsylvania. Even ignoring the word "for," however, there appears to be a boundary on the Commission's authority to review development in the Basin, since § 3.8 only allows the Commission to review projects "having a substantial effect on the water resources of the [B]asin[.]" (Joint App. at 370, § 3.8.) Furthermore, we question the assertion that fracking clearly constitutes a project subject to the Commission's authority, because it is not at all clear on this record how the five million gallons of water used in fracking a well compares with the quantity of water used to perform other activities that few if any people would say the Commission was intended to control.[17]

---

[17] We emphasize that we are presented with a question about the Commission's authority to review and approve "projects" under § 3.8 of the Compact. We are not considering the Commission's authority under any other provisions, such as §§ 5.1-5.5, which address pollution control. We take no position on whether Article 5 provides the Commission an alternative jurisdictional basis to require advance approval of fracking activity.

The Commission counters that, even if it were true that an activity or facility had to be undertaken for the purpose of using water resources for the Commission to have power to review it as a "project," fracking activities satisfy that requirement. First, says the Commission, fracking purposefully uses water because it consumes it, leaving much of the fracking mixture buried and useless (or worse) in the ground. Deliberate, repetitive use of water is an essential part of fracking, and the Commission contends that is enough to conclude that the purpose of fracking is to utilize water resources. Second, the Commission says that, even if one well only uses a relatively minor amount of water, the collective quantity of water used by all the fracking wells that could be drilled in the Basin is so large that it cannot be allowed to escape the Commission's reach. Both of those are serious arguments and deserve careful attention, but they do not foreclose the possibility that Wayne's interpretation of the term "project" is correct.

The Commission also argues that adopting Wayne's understanding of the term "project" is too narrow and would improperly constrain the Commission's authority over other activities in the Basin. Specifically, the Commission contends that Wayne's interpretation of "project" would prevent the Commission from being able to regulate industrial wastewater discharges or hydroelectric power generation facilities because they have purposes other than the mere utilization or management of water. That response, however, only highlights the tension between Wayne's reading and the Commission's reading. It does not prove that the Commission's view of its own powers reflects a better understanding of what the Compact's drafters meant, particularly since that broader interpretation has its own flaws.

As already noted, it has the troubling potential to sweep into the definition of "project" any activity or facility that uses water. Moreover, the Commission seems to be overstating Wayne's argument. Wayne has not said that hydroelectric power plants are not water resource development projects, and it would be foolish to make that argument since the Compact's preamble expressly contemplates a comprehensive plan that provides for the "development of hydroelectric power potentialities[.]" (Joint App. at 360.) Indeed, wholly apart from Article 3 and the Commission's project review authority, Article 9 explicitly grants the Commission authority with respect to hydroelectric power facilities. As for industrial wastewater discharges, they are regulated separately as pollutants under Article 5. Thus, the Commission's arguments do not resolve and perhaps only emphasize the ambiguity of the term "project," as used in § 3.8 of the Compact and as the Commission has applied it to fracking.

ii. *"Project" in Conjunction with "Water Resources"*

We next consider the District Court's use of the defined term "water resources" to interpret the term "project." The Compact defines "water resources" as "water and related natural resources in, on, under, or above the ground, including related uses of land, which are subject to beneficial use, ownership or control."[18] (Joint App. at 363, § 1.2(i).) The

_____

[18] The Compact does not define what it means for "water and related natural resources" to be "subject to beneficial use, ownership or control." (Joint App. at 363, § 1.2(g).) It does not explain whom or what is using, owning, or controlling the water resources. And although that wording suggests that

40

District Court said that reading "project" in conjunction with "water resources" demonstrates that fracking is "a facility undertaken for the utilization of 'water resources'" because "the well pad and related [fracking activities] admittedly involve … water 'in, on, under or above the ground' and 'related uses of land.'"[19] (Joint App. at 46 (citation omitted).) The Commission argues in favor of that line of reasoning, but we are not persuaded that combining "project" and "water resources" resolves the ambiguity in the definition of "project."

Although the District Court's approach cannot be dismissed out of hand, the resulting interpretation is not the only reasonable one and is in fact subject to non-frivolous criticism. Wayne contends that the District Court's interpretation equates to saying a project is any activity for the

---

water and related natural resources may exist in the Basin that are *not* subject to beneficial use, ownership, or control, it is unclear what may constitute such water resources.

[19] When the definitions of "project" and "water resources" are combined, the following definition is produced:

> [A project is] any … activity which is separately … identified by the [C]ommission, or any separate facility undertaken …, for the … utilization … or management of water and related natural resources in, on, under, or above the ground, including related uses of land, which are subject to beneficial use, ownership or control.

(Joint App. at 363, § 1.2(g), (i).)

use of "'*land* and related natural resources … including related uses of *water*' in the Basin," rather than the other way around. (Opening Br. at 34.) Read one way, the District Court's approach has merit. Activities and facilities undertaken with some goal that uses the land in a way related to the management or utilization of water could indeed be projects. However, read as Wayne suggests, the District Court's approach arguably inverts the most natural reading of the text. Even if Wayne's interpretation is not ultimately the correct one, at the very least, it casts doubt upon the District Court's interpretation.

### iii. *"Project" in Light of Other Compact Provisions*

Looking at the Compact as a whole, the use of the word "project" throughout the instrument exacerbates the ambiguity. Provisions in a compact should be interpreted in light of the document as a whole. *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1045 (9th Cir. 2015); *see also* Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole[.]"). Wayne argues that the term "project," read in the context of the entire Compact, demonstrates that it covers only water resource projects, or projects undertaken with the specific purpose of conserving, using, or managing water resources. The Commission, the Delaware Riverkeeper Network, and Ms. van Rossum counter that the Compact, read as a whole, shows that any activity or facility with major effects on water quantity or quality can be a "project." Once again, neither party plainly has the better of the argument concerning the meaning of "project" in § 3.8 and we are left to conclude that the term is ambiguous.

42

There are other provisions in the Compact that suggest that the drafters did not intend to define "project" as broadly as the Commission contends. For example, rules of contract interpretation advise us to interpret the meaning of a word by considering the words associated with it. *See Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 520 (3d Cir. 2012) (observing that "[t]he ancient maxim 'noscitur a sociis' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep" (citation omitted)). Broadly defining "project" to include Wayne's proposed fracking-related activities would sweep in undertakings that could appear out of place among the (admittedly non-exhaustive) list of projects and facilities expressly set forth in the description of the Commission's general powers. That list includes:

> water and waste treatment plants, stream and lake recreational facilities, trunk mains for water distribution, local flood protection works, small watershed management programs, and ground water recharging operations[.]

(Joint App. at 369, § 3.6(b).) Those are arguably different in purpose and in kind than fracking operations.[20]

---

[20] Other provisions may also highlight potential issues or inconsistencies associated with broadly defining the term "project." (*See, e.g.*, Joint App. at 353-409, §§ 1.5 (preserving the role of existing federal and state agencies), 3.3 (defining the Commission's power to allocate water within the Basin), 3.5 (limiting the powers of the Commission), 11.1-.2 (discussing the Commission's jurisdiction relative to other federal, state, and local agencies), 11.4 (requiring the

Nevertheless, there are provisions in the Compact that indicate a broad definition of "project" may well have been intended. For example, § 1.3(e) states that the purposes of the Compact include, among other things:

> encourag[ing] and provid[ing] for the planning, conservation, utilization, development, management and control of the water resources of the [B]asin … and … apply[ing] the principle of equal and uniform treatment to all water users who are similarly situated and to all users of related facilities[.]

(Joint App. at 364, § 1.3(e).) The Commission makes a forceful argument that exempting fracking activities from the scope of the term "project" would give natural gas producers preference over other industrial water users that are regulated. Furthermore, § 3.6 broadly states that the Commission has any powers "necessary or convenient to carry out its express

---

Commission to establish project cost and evaluation standards), 12.2 (contemplating capital funding and expenses associated with project and facility construction), 12.8 (discussing tax exemptions for bonds issued by the Commission), 13.1-.2 (calling for the development of a comprehensive plan and water resources program), 15.1 (reserving rights and powers belonging to the United States Congress).)

44

powers or which may be reasonably implied therefrom."[21] (Joint App. at 370, § 3.6(h).)

In sum, interpreting the term "project" in light of the provisions in the whole Compact does not remove the ambiguity.

### 4. The Need for Further Fact-Finding

The parties have identified conflicting reasonable interpretations of the term "project," which counsels us to conclude that the District Court erred when it decided that the Commission's project review authority under the terms of the Compact unambiguously includes Wayne's proposed activities. To be clear, at this stage, we are not adopting or endorsing either Wayne's interpretation or the Commission's, or anyone else's. We are simply noting that the parties have posited potentially reasonable interpretations that bear their own strengths and weaknesses. On one side, Wayne's interpretation fails to explain how, at the very least, its proposed water storage tanks are not subject to the Commission's project review authority given that it agrees that "there can be components of an undertaking that can be a project." (Oral Arg. Tr., Nov. 7, 2017, at 8:23-24.) Wayne is

---

[21] The Delaware Riverkeeper Network and Ms. van Rossum also contend that the Compact contemplated the Commission's jurisdiction to include both "water and related resources" because that term is used in numerous places throughout the Compact. (Intervenor Br. at 12.) But despite its efforts to tie "related resources" to fracking, those parties have not shown how "related resources" extends beyond "water resources" as the Compact broadly defines that term.

bound by the allegations in its complaint, and those allegations include that water "will be managed and delivered to the [w]ell [p]ad" site and presumably stored until used, but, oddly, that none of "the appurtenant facilities to be constructed" will be for the "control … or management of water resources." (Joint App. at 70-71.)[22] On the other side, the interpretation advanced by the Commission, the Delaware Riverkeeper Network, and Ms. van Rossum can be seen as unduly broad to the extent it could permit the Commission to exercise authority to review and control nearly all productive land use within the Basin. Furthermore, their interpretation does not effectively address

[22] We note as well that in its briefing before us, Wayne characterizes the issue on appeal as "whether land cleared to accommodate a natural gas well, known as a 'well pad,' and the natural gas well drilled on the pad, separately, or considered together, constitute a 'project' subject to review by the Commission under Section 3.8 of the Compact." (Opening Br. at 14.) An argument can be made that that restatement of the issue is narrower than the language in the complaint and that Wayne is essentially trying to characterize what it seeks as a less-aggressive limiting of the scope of the Commission's "project" review authority. Nothing in our opinion should be interpreted on remand as limiting the broad language of the complaint – which defines the dispute before the Court – or the District Court's discretion to manage the process of presenting and deciding any narrower questions which may prove particularly important to bringing this case to a final resolution (and perhaps to crafting a final remedy). Of course, that process of clarifying the issues to be litigated may include appropriate alterations to Wayne's complaint, which may be amended in the Court's discretion. *See* Fed. R. Civ. P. 15(a)(2).

46

the legislative amici's argument that the Compact contains no clear indication that Pennsylvania intended to cede its sovereign power so extensively to the Commission.

Because we interpret the Compact as a contract and we have determined that it is ambiguous as to whether Wayne's proposed activities are subject to the Commission's project review authority under § 3.8, we are left to use "other interpretive tools to shed light on the intent of the Compact's drafters." *Tarrant*, 569 U.S. at 631. The problem, however, is that those interpretive tools require factual determinations to be made about the Compact drafters' intent. *See Sumitomo Machinery Corp. of Am., Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 335 (3d Cir. 1996) (remanding a contractual dispute to the district court for further fact-finding because, "[w]hen a contract is ambiguous, the 'fact-finder must attempt to discover what the contracting parties … intended [the disputed provisions] to mean'" (alterations in original) (citation omitted)). The District Court must have the opportunity to evaluate in the first instance how other interstate compacts, the parties' course of performance, and the negotiation and legislative history of the Compact, among other evidence, bear on the question of intent. The interpretation that should prevail is the one that aligns best with the drafters' intent.[23]

---

[23] The Commission contends that its interpretation of the term "project" is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). But, as we noted earlier, the Supreme Court has clearly instructed that "compacts are construed as contracts under the principles of contract law." *Tarrant*, 569 U.S. at 628. Because the Compact is not to be interpreted as a statute, *Chevron* deference has no place here.

## IV.    CONCLUSION

For the foregoing reasons, we will vacate the order of dismissal and remand the case for further proceedings consistent with this opinion.

*Wayne Land and Mineral Group, LLC v. Delaware River Basin Commission, et al. No. 17-1800*

SCIRICA, *Circuit Judge*, concurring

I agree with my colleagues that the term "project," as used in Section 3.8 of the Delaware River Basin Compact, is ambiguous, and that the matter should be remanded to the District Court for fact-finding respecting the Compact drafters' intent. But I have a considerable concern—involving my colleagues' characterization and evaluation of some of the parties' arguments on the central issue in this case—that precludes me from joining in full their well crafted Opinion.

My colleagues have provided an assessment of the strengths and weaknesses of some of the parties' arguments. In light of our decision to remand, however, I see no need to characterize or evaluate the merits of the parties' contentions. I fully agree that, "[t]o be clear, at this stage, we are not adopting or endorsing either Wayne's interpretation or the Commission's, or anyone else's." Maj. Op. at 46. The parties have raised key arguments the District Court must evaluate in the first instance on remand, without consideration of our analysis of the strengths and weaknesses of the case.

Because I would not discuss the merits of the parties' arguments, I concur.

1