**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1243
_____

FED CETERA, LLC, a New Jersey limited liability company,

Appellant

v.

NATIONAL CREDIT SERVICES, INC., a Washington
Corporation
_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil No. 1-17-cv-02809
District Judge: Honorable Robert B. Kugler
_____

Argued: October 22, 2018

Before: KRAUSE, COWEN, and FUENTES, *Circuit Judges*

(Opinion Filed:  September 17, 2019)

Michael J. McCaney, Jr.     [ARGUED]
Keller & Goggin
1528 Walnut Street
Suite 900
Philadelphia PA 19102

      *Counsel for Appellant Fed Cetera, LLC*


Leigh Ann Benson
Arthur P. Fritzinger          [ARGUED]
David J. Walton
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

      *Counsel for Appellee National Credit Services, Inc.*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

National Credit Services (National Credit), a debt collection agency, sought opportunities to contract with the federal government to provide debt collection services. In the hopes of winning such a contract, it reached an Agreement with a company called Net Gain, which was in the business of offering networking relationships to its clients. In return for introductions, National Credit agreed to pay Net Gain a

finder's fee for any related contract that National Credit "consummated" during the term set in the Agreement. A few years later, Net Gain assigned its rights in the Agreement to Appellant Fed Cetera.

During the effective period of the Agreement, National Credit signed a contract with the federal government. It did not begin performance on that contract until late 2016, after the Agreement's applicable period ended. Because National Credit had not begun performance during the contract period, it refused to pay Fed Cetera the finder's fee, arguing that it had not "consummated" the federal contract. Fed Cetera sued, and National Credit moved for judgment on the pleadings.

After reviewing the Agreement, the District Court concluded that the Agreement required some amount of performance on the federal contract to trigger a finder's fee, which had not occurred during the Agreement's relevant period. Thus, it granted judgment in National Credit's favor. Fed Cetera appeals that ruling now.

The question before us, then, is whether the terms of the Agreement required some degree of performance while the Agreement was in force in order for a contract to be "consummated." We conclude that it did not, and, for the reasons stated here, we reverse.

**I.**

To win a student debt collection contract from the federal government, a debt collector typically must follow a convoluted but—within the industry—well-known path. The

3

company must begin by working as a subcontractor to a current federal contractor. If that subcontract goes well, then the company may have an opportunity to receive a direct federal contract the next time around.

National Credit sought such an arrangement. In an effort to find a federal contractor with which it could subcontract, National Credit sought out Net Gain for networking opportunities. National Credit and Net Gain entered into their Agreement on February 1, 2010. Under that agreement, National Credit owed Net Gain—and later Net Gain's assignee Fed Cetera[1]—the finder's fee for any related contract Net Gain consummated between the signing date and February 1, 2016.

Specifically, the Agreement states that National Credit owes a fee any time a "Fee Transaction . . . is consummated."[2] A "Fee Transaction," further, can mean either one of two things: (1) "the consummation, with any Federal Contractor, of any transaction related to 'teaming' or 'subcontracting.'"; and (2) the "subsequent consummation of any contract with any Federal government agency for which the Principal has been invited to compete, and is later awarded a contract to perform" where that contract "shall have arisen due to any 'teaming' or 'subcontracting' engagement [Net Gain] may have facilitated in advance of any such award."[3] Once a Fee Transaction is consummated, the fee was "due and

---

[1] Net Gain assigned its rights to Fed Cetera in 2013, after it had introduced National Credit to the federal contractor whose subcontract agreement triggered the first finder's fee.

[2] App. 27.

[3] *Id.*

4

payable until fees are no longer generated from any and all Fee Transactions, within thirty (30) days after each receipt during such period by Principal . . . of revenue resulting from or in any way related to the Fee Transaction, including any fees paid after the expiration or termination of any contract."[4]

In other words, Net Gain agreed to introduce National Credit to a federal contractor. If the introduction worked out, National Credit would get a subcontract with that contractor. That subcontract could ultimately lead National Credit to win a direct federal contract of its own. National Credit would owe Net Gain a 2.5% finder's fee for both contracts—assuming they were "consummated" within the period set by the Agreement. National Credit needed to pay Net Gain that fee within thirty days after it received any revenue related to the Fee Transactions.

The structure of this arrangement is not at issue. Nor is whether a given contract falls within the terms of the Agreement.[5] National Credit signed two relevant contracts

---

[4] *Id.*

[5] In its brief, National Credit appears to suggest that Fed Cetera has not alleged sufficient facts about the federal contract. *See* Appellee Br. 16 ("Fed Cetera failed to plead anything about the [federal] Contract, including anything about the . . . substantive terms."). It is unclear to what end National Credit offers this argument, but to the extent National Credit adds this as a separate ground to challenge the sufficiency of Fed Cetera's pleadings, it is forfeited, as there is no indication this was argued before or considered by the District Court. *See* App. 7 ("For purposes of this motion, the only relevant question is whether the execution of the [federal] Contract is a

during the Agreement's operative period. The first was a subcontract with a third-party federal contractor. National Credit regularly made finder's fee payments for that subcontract without apparent dispute.

The second, which is in dispute, was a direct contract with the federal government, signed in 2014. However, National Credit did not begin performance on that contract until September 2016, several months after the Agreement's term concluded. Because it had not yet begun performance, National Credit refused to pay Fed Cetera the finder's fee, asserting that the language of the Agreement did not require it to because no Fee Transaction had been consummated.

Fed Cetera sued. National Credit moved for judgment on the pleadings, arguing that the terms of the contract were plainly in its favor. The District Court agreed with National Credit. The District Court concluded that in order for a Fee Transaction to be consummated, the Agreement required some

'consummation' within the meaning of the agreement."); App. 49-52 (detailing National Credit's arguments before the District Court). The parties in any event agree that the federal contract at issue bears the contract number ED-FSA-14-D-0018, and, as a federal contract, is a matter of public record, which we may consider here. *See Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 271 (3d Cir. 2013). The particulars of the federal contract are otherwise irrelevant to the question on appeal, which concerns only whether, under the terms of the Agreement, it was consummated during the Agreement's applicable period. Whether National Credit actually owes any fees to Fed Cetera is a question for another day.

degree of performance on the contract. Since National Credit had not yet begun that performance by the end of the Agreement's applicable period, the federal contract fell outside the terms of the Agreement, and National Credit owed no finder's fee. The District Court entered judgment in National Credit's favor, and Fed Cetera timely appealed.[6]

**II.**

The parties agree that New Jersey law applies.[7] "To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result."[8] Under

---

[6] National Credit is a Washington corporation, and Fed Cetera is a New Jersey limited liability company. This is a contract dispute between diverse parties, governed by New Jersey law. The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and we have appellate jurisdiction through 28 U.S.C. § 1291.

[7] The Court exercises plenary review of judgments on the pleadings entered under Federal Rule of Civil Procedure 12(c). *Jablonski v. Pan Am World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988). "A motion for judgment on the pleadings will be granted . . . if, on the basis of the pleadings, the movant is entitled to judgment as a matter of law." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262 (3d Cir. 2008); *see* Fed. R. Civ. P. 12(c). We accept the nonmoving party's factual allegations as true and construe all allegations in the light most favorable to that party. *Id.*

[8] *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).

7

New Jersey law, courts enforce contracts looking at the intent of the parties, "the contractual terms, the surrounding circumstances, and the purpose of the contract."[9]  "Whether a contract is clear or ambiguous is a question of law."[10]  "If the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect."[11]  "Even in the interpretation of an unambiguous contract, we may consider all of the relevant evidence that will assist in determining its intent and meaning."[12]  If the contract is "ambiguous, the 'fact-finder must attempt to discover what the contracting parties . . . intended [the disputed provisions] to mean,'" and accordingly, judgment on the pleadings would not be appropriate.[13]

The only question here is when, under the terms of the Agreement, National Credit's second contract was "consummated."  The Agreement's applicable period lasted

[9] *Marchak v. Claridge Commons, Inc.*, 633 A.2d 531, 535 (N.J. 1993).

[10] *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir. 1987).

[11] *Manahawkin Convalescent v. O'Neill*, 85 A.3d 947, 958-59 (N.J. 2014) (internal quotations and citation omitted).

[12] *Id.* at 959.

[13] *Wayne Land & Mineral Grp. LLC v. Del. River Basin Comm'n Maya Van Rossum*, 894 F.3d 509, 534 (3d Cir. 2018); *see also Michaels v. Brookchester, Inc.*, 140 A.2d 199, 204 (N.J. 1958) ("The trial judge correctly found the lease to be ambiguous . . . .  In those circumstances, it was proper to submit the issue of the meaning of the contract to the jury as one of fact.").

until February 2016. If the federal contract was consummated before that date, then National Credit owes a finder's fee. If it was consummated after, then National Credit does not.

The Agreement does not define any form of "to consummate." Both parties argue that the term "consummate" is clear on its face, although they differ on what is clear about it. Fed Cetera argues that, in the context of the Agreement, "consummated" means "signed," "formed," or "executed," and asserts that National Credit consummated the second contract when National Credit executed it with the government in 2014. National Credit argues the opposite, asserting that the District Court correctly found that "consummated" requires some degree of performance of a contract.

New Jersey courts have not provided dispositive guidance on the meaning of the term "consummate." The cases offer competing, context-specific definitions. The case most cited by National Credit and the District Court is *Todiss v. Garruto*, a New Jersey Superior Court Appellate Division decision.[14] *Todiss* concerned whether a broker was still owed a commission from a seller even after a third-party buyer backed out.[15] The court in *Todiss* relied on the explicit provision in the parties' agreement that stated "the commission was to be 'contingent upon the transaction being consummated and in the event that said transaction is not consummated then and in that event no commission shall be payable to said brokers.'"[16] The court held that "[i]n common acceptation the meaning of the transitive verb 'consummate' is 'to bring to

---

[14] 112 A.2d 285 (N.J. Super. Ct. App. Div. 1955)
[15] *Id.* at 286.
[16] *Id.* at 289-90.

9

completion that which was intended or undertaken to be done.'"[17]  *Todiss* concluded that, because the sale never took place, the broker wasn't owed a fee.[18]

This case, however, does not involve a sale of something, and so *Todiss* is not entirely on point.  A classical contract is formed, and the legal duties attach, with offer, acceptance and consideration, not upon the completion of some sort of performance—except, of course, where acceptance is communicated by performance.[19]  Fed Cetera's position here, then, is consistent with *Todiss*; what was arguably "brought to completion" here was the negotiation and formation of the federal contract.

Shortly after *Todiss*, the New Jersey Supreme Court decided *Klos v. Mobil Oil Co.*[20]  *Klos* involved a question of when a particular life-insurance policy became effective.  The Supreme Court held that when a plaintiff "mailed in his completed [insurance] application, he accepted [the insurer's] offer and a contract for insurance was consummated with all of the essential elements agreed upon."[21]  The Supreme Court unambiguously concluded that a contract was "consummated" upon acceptance, without any performance necessary on any party's part.  We cannot say then, that New Jersey law requires

---

[17] *Id.* at 287.

[18] *Id.* at 290.

[19] *See* Restatement (Second) of Contracts § 54.

[20] 259 A.2d 889, 892 (N.J. 1969).

[21] *Id*.

10

some performance on a contract before it is consummated.[22] Similarly, our Court and others have held in other circumstances that a contract is consummated when formed.[23]

The next step is to look at the totality of the parties' Agreement, to see whether the language and context make the issue clearer. When the District Court undertook that analysis, it read "consummate" in the Agreement to mean to "carr[y] out."[24] In doing so, the District Court relied on *Todiss*, and also understood *Black's* Law Dictionary to be defining "consummate" as "completed"; "fully accomplished."[25]

---

[22] *See also Johnson & Johnson v. Charmley Drug Co.*, 95 A.2d 391, 397 (N.J. 1953) ("An expression of assent that modifies the substance of the tender . . . is yet not an acceptance and does not consummate a contract."); *Gamble v. Connolly*, 943 A.2d 202, 209 (N.J. Super. Ct. Civ. Div. 2007) [T]here was a degree of acceptance on the part of Gamble and an agreement was consummated . . . .").

[23] *See Western Cartridge Co. v. Emmerson*, 281 U.S. 511, 512 (1930) ("[S]ending written acceptance consummates contracts of sale."); *F.A.R. Liquidating Co. v. Brownell*, 209 F.2d 375, 379 (3d Cir. 1954) (assignment of patents "consummated" upon deposit of an acceptance cable by a certain time). The Truth in Lending Act, 15 U.S.C. § 1635(f), uses the statutory phrase "consummation of the transaction," which we have interpreted to mean the date upon which the parties formed a contract. *See Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 896, 902-03 (3d Cir. 1990).

[24] App. 9 (rephrasing the Agreement to read "If . . . [National Credit] *carries out* a fee transaction, it shall pay Fed Cetera" the finder's fee).

[25] *Id.* at 7.

The District Court then redefined the term "Fee Transaction" in the Agreement. It used *Black's* definition of the word "transaction" to redefine the term, and held that "a transaction is a noun that means 'an action.'"[26] The District Court concluded that, because "consummate" means "to carry out," and a transaction "is a noun that means 'an action,'" then to "consummate a fee transaction" under the Agreement "implies two separate actions at distinct times."[27] Using that phrasing, the District Court concluded that the Agreement "expressly contemplates a contract being awarded and then later performed."[28]

However, we believe that there are two difficulties with the District Court's analysis. The first is that the District Court relied, in part, on the adjective definition of "consummate," not the verb definition. The difference is relevant; the adjective form of consummate, pronounced "con-sum-it,"[29] carries a different meaning and different common usage. A person who is "the consummate statesman," or has "consummate elegance," is the fulfillment of an ideal; complete and satisfied in all respects. Upon hearing something is a "consummate contract," a typical listener is more likely to understand it as an archetypal contract, not a contract that has been performed in some respect.

---

[26] *Id.* at 9.

[27] *Id*.

[28] App. 10 (emphasis omitted).

[29] Or "känsəmət" in the International Phonetic Alphabet.

Looking at the correct *Black*'s definition—the verb definition—makes it clearer that "consummate," pronounced "con-sum-ayt,"[30] carries less emphasis on something being fulfilled or fully completed. While the verb can still mean "to bring to completion," it can also mean "to achieve" or "to perfect." To "achieve" a contract suggests that a contract has formed, not that a party started performance on a contract.

A second error poses a greater problem. After defining "to consummate," the District Court then used *Black's* to further define the "transaction" in "Fee Transaction" to mean "a noun that means 'an action.'"[31] The District Court used its definitions of "to consummate" and "transaction" to conclude that a "consummated Fee Transaction" in the Agreement implied two separate actions occurring at different times.

But unlike "consummate," "Fee Transaction" is a defined term in the Agreement. The *Black's* definition, or any common use of the word "transaction," is irrelevant. The parties bargained for an explicit definition that supersedes any others. The District Court erred by substituting its definition for the parties' own.

As the parties define it, a "Fee Transaction" means "the consummation" or "subsequent consummation" of one of the two listed types of debt collection contracts. In other words, under the Agreement, National Credit owes a fee when "a consummation [of a relevant contract] is consummated." While an awkward construction, the phrase's meaning is no

---

[30] Or "känsəmāt" in International Phonetic Alphabet.
[31] App. 9.

13

less apparent than "an achievement is achieved" or "an agreement is agreed upon." None of those constructions imply a two-step process, as the District Court read the Agreement to require.

So evaluating the Agreement using the terminology and word definitions outlined above, a Fee Transaction is consummated when it is formed, not when performance has begun. While it is conceivable that another contract might use "consummate" in a way that refers to performance, both the text of the Agreement and the actions of the parties indicate that is not the case here. The Agreement states that any fee "shall be due and payable until fees are no longer generated from any and all Fee Transactions, within thirty (30) days after each receipt during such period by Principal . . . of revenue."[32] Accordingly, the Agreement contemplates the ongoing payment of the finder's fee throughout the life of a relevant contract every time National Credit received revenue from its work on the contract. Because fees are owed only after a contract is "consummated," the Agreement cannot be using "consummation" to mean "fully complete performance on the contract." This is consistent with National Credit's own behavior, which concedes Fed Cetera's allegation that it regularly paid the finder's fee throughout the life of the first contract—not at the completion of work on that contract.

This interpretation also comports with the parties' business relationship under the Agreement as a practical matter. The Agreement envisions that Fed Cetera's—formerly Net Gain's—role is strictly that of a "[f]inder[]": Its job is to

---

[32] App. 27.

14

procure contracts for National Credit by making "introduc[tions]" and "assisting . . . with negotiations," but it does not play any role in National Credit's performance of work under those contracts.[33] Its only function is to facilitate National Credit's successful formation of contracts. Assuming the parties are rational actors,[34] the economics of the contract are plausible only if Fed Cetera's compensation turns on the satisfactory completion of its function—not events, like performance by National Credit, that post-date the only service Fed Cetera performs and are outside of its control. If the compensation provision were structured the way National Credit contends, Fed Cetera could lose out on a commission, to National Credit's gain, simply because of gamesmanship by National Credit or mere happenstance. If Fed Cetera helped National Credit negotiate and form a contract with a third party shortly before the end of the Agreement's term, for example, National Credit avoid paying Fed Cetera from simply by delaying the start of its work for the third party, or because the third party is slow to delegate work to National Credit. Reading a contract to produce this sort of "absurd result" is disfavored.[35]

The only way to understand "consummation" under the Agreement in a manner consistent with New Jersey law,

---

[33] App. 26.

[34] *See Holtham v. Lucas*, No. A-3073-17T1, 2019 WL 2998225, at *1 (N.J. Super. Ct. App. Div. July 10, 2019) ("[T]raditional contract law principles . . . are founded on the premise that contracting parties are rational economic actors . . . .")

[35] *Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d 386, 392 (N.J. 2019).

15

the word definitions, context within the Agreement, the parties' own behavior, and their relationship as envisioned by the Agreement, is to understand it to mean forming a qualifying contract.[36]   Alternative readings would render other terms superfluous or internally inconsistent and would not accord with the parties' own behavior.

## III.

For the foregoing reasons, the decision of the District Court will be reversed and the judgment on the pleadings in favor of National Credit vacated.  This matter will be remanded for further proceedings consistent with this Opinion.

---

[36] To underscore the weakness of National Credit's position, we note that even if we were to conclude that the Agreement's language is ambiguous, that would also require us to reverse because, as explained above, the meaning of the contract would become a fact question for a jury. *See Wayne Land & Mineral Grp. LLC*, 894 F.3d at 534.  Whatever arguments one can make about the best reading of "consummate" in the Agreement, the notion that it unambiguously reflects National Credit's proposed interpretation is not plausible.