PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 20-1878

———————

In re:  WEINSTEIN COMPANY HOLDINGS LLC, et al.,

Debtors

Y MOVIE, LLC; Y THEATRICAL, LLC; YFE HOLDINGS,
INC.; OA3, LLC; RMF, LLC,

Appellants

———————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-19-cv-00675)
District Judge: Honorable Maryellen Noreika

———————

Argued January 13, 2021

Before: AMBRO, KRAUSE, and PHIPPS, Circuit Judges

(Opinion filed:  May 21, 2021)

Matthew G. Bouslog
Gibson Dunn & Crutcher
3161 Michelson Drive
Irvine, CA  92612

Blaine H. Evanson
Gibson Dunn & Crutcher
3161 Michelson Drive
Suite 1200
Irvine, CA 92612

Robert A. Klyman (Argued)
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071

Michael R. Nestor
Young Conaway Stargatt & Taylor
1000 North King Street
Rodney Square
Wilmington, DE 19801

Max Schulman
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Counsel for Appellants


Rachel E. Albanese
DLA Piper LLP

1251 Avenue of the Americas
27th Floor
New York, NY 10020

Thomas R. Califano (Argued)
DLA Piper LLP
Sidley Austin
787 Seventh Avenue
New York, NY 10019

Maris J. Kandestin
R. Craig Martin
DLA Piper LLP
1201 North Market Street
Suite 2100
Wilmington, DE 19801

       Counsel for Appellee Spyglass Media Group,
       LLC

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

When a debtor sells its business in bankruptcy, it negotiates what assets and liabilities are transferred to the buyer, including contracts with continuing debtor obligations. The terms of the sale (often negotiated quickly)—embodying

what is sold and what is left behind—are not always clear, creating confusion and disputes. We have such a case here, in essence one of contract interpretation.

A group of investors (the "Investors") provided funding to The Weinstein Company and its affiliates ("TWC" or the "Debtors") in exchange for a share of future profits in certain movies (the "Films"). When TWC declared bankruptcy, it sold substantially all its assets to Spyglass Media Group, LLC (also known as Lantern Entertainment LLC) under § 363 of the Bankruptcy Code, which they documented in an Asset Purchase Agreement (the "APA").[1]

The Investors argue that, under the APA, Spyglass bought the Investment Agreements and assumed the associated obligations, but Spyglass disagrees. Although the Investors present creative and plausible arguments, we affirm the District Court's affirmance of the Bankruptcy Court's decision and hold that, under the APA, the Investment Agreements are not "Purchased Assets" and the associated obligations are not "Assumed Liabilities."

---

[1] The Bankruptcy Code allows the debtor, after notice and a hearing, to sell its property "free and clear of any interest in such property," subject to certain conditions and applicable non-bankruptcy law. 11 U.S.C. § 363(f). This means that successor liability is often extinguished in a 363 sale. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 285 (3d Cir. 2003). However, buyers can and typically do assume liabilities voluntarily under the terms of the sale.

4

## I.

The Investors provided funding to the Debtors through twelve sets of Investment Agreements, each relating to a different Film.  In exchange for their upfront contribution, the Investors were to receive a share of the Films' profits (if any existed), though they did not own any intellectual property in them.[2]  Further, the Investors agreed that the Investment Agreements are not executory contracts under the Bankruptcy Code, as they already funded each investment and do not have remaining material obligations under those Agreements. Investors' Br. at 16; *see In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010).[3]

---

[2] Many of the Investment Agreements provided for the Investor to have a lien on the Film's profits to secure TWC's obligations.  However, the security interests apparently were not deemed meaningful, for no financing statements were filed to perfect the liens (perhaps because the purported collateral comprised of speculative streams of payments).  *See* Oral Arg. Tr. 4:7–14.

[3] Whether a contract is "executory" has significant implications for its treatment under the Bankruptcy Code, the main one being that a debtor has the right to assume (*i.e.*, continue) or reject (*i.e.*, breach) an executory contract with court approval.  *See* 11 U.S.C. § 365(a).  As background, our Circuit has adopted the definition of an executory contract proposed by Professor Vern Countryman—"[A] contract under which the obligation of both the bankrupt and the other party to the contract are so far [unperformed] that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Exide*, 607 F.3d at 962 (internal quotation marks and citation omitted).

5

On March 19, 2018, following many sexual misconduct allegations against TWC's co-founder Harvey Weinstein, TWC sought bankruptcy protection to facilitate the sale of its assets to Spyglass. That same day, TWC and Spyglass signed the APA, which was later amended twice with input from creditors. The sale closed in July 2018 and Spyglass paid $287 million.

One important function of the APA was to specify the assets Spyglass would purchase and the liabilities it would take over from TWC. "Purchased Assets," as its name suggests, are part of the sale, while "Excluded Assets" obviously are not. App. 843–44, APA §§ 2.1, 2.2. Spyglass also took the bitter with the sweet and agreed to assume all liabilities associated with the Purchased Assets. App. 844, APA § 2.3. They are defined broadly and can include some "Contracts," which the APA states are "any written contract, lease, license, agreement, arrangement, understanding, commitment, instrument, guarantee, undertaking, bid or proposal." App. 897, APA Ex. A-4. The main category of Contracts within Purchased Assets are "Assumed Contracts," which are those Contracts that Spyglass designates in writing it wants to buy and assume, though the parties dispute just which Contracts can be Assumed Contracts. App. 917, APA Sch. 2.1(e). Subject to certain conditions, Spyglass was given until November 2018, almost four months after the sale's closing in July 2018, to designate or remove Assumed Contracts. App. 850, APA § 2.8(i); App. 1084–85, 1087.

This dispute stems in part from confusing notices about Assumed Contracts filed by the Debtors and Spyglass. In May 2018, the Debtors filed a Final List of Potentially Assumed

6

Contracts and Leases ("the Assumed Contracts Schedule") that purported to identify the "Assumed Contracts . . . subject to assumption and assignment." App. 668–69. That Schedule listed all the Investment Agreements, but with a disclaimer that "the presence of an Assumed Contract and Lease listed on Exhibit 1 attached hereto does not constitute an admission that such Assumed Contract and Lease is an executory contract or unexpired lease." App. 669.

The Debtors later tried to remove the Investment Agreements from the Assumed Contracts Schedule but did not do so clearly. In the June 2018 Contract Notice, they listed eight of the Investment Agreements on a schedule that "identifies certain non-executory contracts that are being removed from the Assumed Contracts Schedule." App. 10, 678. Following the sale closing in July, Spyglass filed the November 2018 Contract Notice, which listed nine Investment Agreements as "Excluded Contracts," therefore not Assumed Contracts. App. 11, 847, 1483, 1558. The effect of these confusing contract notices is disputed, but the key takeaway is that not all the Investment Agreements were removed from the Assumed Contracts Schedule. *See* Spyglass Br. at 17 (conceding that one Investment Agreement remained on the list of contracts to be assumed).

The Investors were essentially quiet until January 2019, when they sent a letter to Spyglass requesting payments (*i.e.*, their asserted share of a Film's profits) due under one of the Investment Agreements. Spyglass refused. In response, the Investors filed a motion in the Bankruptcy Court seeking a judgment that Spyglass bought all the Investment Agreements under the APA. The Bankruptcy Court denied the motion, and the District Court affirmed.

7

II.

We look anew at the District and Bankruptcy Courts' conclusions of law. *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 816 (3d Cir. 2010) (citation omitted). Our task here is to interpret the APA, which by its terms is governed by federal bankruptcy and Delaware law. App. 880, APA § 13.6(a). Where a contract is unambiguous, we interpret it as a matter of law. *See Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 528 (3d Cir. 2018).

III.

This case reduces to a single question: Did Spyglass assume TWC's obligations under the Investment Agreements? We first address the Investors' primary argument that the Investment Agreements are Assumed Contracts and thus Purchased Assets whose obligations were assumed by Spyglass.

The parties agree that the Investment Agreements are Contracts but disagree if they are Assumed Contracts. In turgid legalese meant to be precise but hardly simple, section 2.8(a) of the APA provides as follows (with explanatory annotations):

> [**First sentence**] Section 2.8(a) of the Disclosure Schedule sets forth a list of all executory Contracts relating to the Business or the Purchased Assets to which one or more of Seller Parties [**TWC**] are party (the "Available Contracts") . . . and which may be updated from time to time after the Execution Date by

8

the Seller Parties to add any Contracts not included on such schedule as of the Execution Date. [**Second sentence omitted**] . . . [**Third sentence**] Prior to the Closing Date, Buyer [**Spyglass**], in its sole discretion by written notice to the Seller Parties, shall designate in writing which Available Contracts . . . relating to the Business or the Purchased Assets that Buyer wishes to "assume" (the "Assumed Contracts") and subject to the right of Buyer, at any time prior to the Closing Date, Buyer may, in its sole discretion, determine not to "assume" any Available Contracts previously designated as an Assumed Contract. [**Fourth sentence**] All *executory* Contracts of the Seller Parties that are listed on Section 2.8(a) of the Disclosure Schedule as of the Closing Date and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Amounts related to any Excluded Contracts).

App. 847 (emphasis and explanatory notes added). The Second Amendment to the APA, executed in July 2018 before the sale closed that month, added the word "executory" (italicized above) in the fourth sentence. App. 949, 1083.

We conclude that, based on the APA and bankruptcy law, the Investment Agreements are not Assumed Contracts. First, section 2.8 limits Assumed Contracts to executory Contracts, but the Investment Agreements are, without dispute, not executory. Assumed Contracts can only be selected from the list of Available Contracts, which is "a list of all *executory* Contracts." App. 847, APA § 2.8(a) (emphasis added). The

9

Investors rejoin that because the second clause of the first sentence in section 2.8(a) says that "any Contracts" can be added to the list, that means non-executory Contracts can be Available Contracts and thus can be designated as Assumed Contracts subject to sale.

We reject that reading. The term "Available Contracts," which lists those Contracts that can be designated for assumption by Spyglass, is limited to executory Contracts (the first clause of the first sentence in section 2.8(a)). Further, the references to cure amounts elsewhere in the section make sense only for executory contracts. *See* 11 U.S.C. § 365(b)(1)(A) (discussing "cure" obligations in the context of executory contracts).

Second, the word "assume" is a term of art in bankruptcy that applies only to executory contracts. *See* 11 U.S.C. § 365(a); *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir. 1995) ("In cases where the nonbankrupt party has fully performed [that is, a non-executory contract], it makes no sense to talk about assumption or rejection."); *In re Exide Techs.*, 378 B.R. 762, 765 (Bankr. D. Del. 2007) ("Section 365 allows debtors to assume or reject an executory contract[] but provides no such option for a non-executory contract."). Here, the APA is to be "construed in accordance with federal bankruptcy law." App. 880, APA § 13.6(a). The Investors do not offer any persuasive arguments that the APA deviated from the Bankruptcy Code. Read as a whole, the APA is not ambiguous—an Assumed Contract must be an Available Contract and an Available Contract must be an executory Contract, so Assumed Contracts must be executory.

10

Third, because a non-executory Contract cannot be an Assumed Contract, it does not matter if it appeared on the Assumed Contracts Schedule. We acknowledge that the Debtors and Spyglass did not clearly remove all the Investment Agreements from the Assumed Contracts Schedule, and despite two attempts to do so in the June and November 2018 Contract Notices, at least one Investment Agreement still remained on that Schedule. Spyglass Br. at 17. But for Spyglass this mistake is not fatal to its case that none of the Investment Agreements were Assumed Contracts, as it only failed to remove what should not have been there in the first place.[4] Thus we do not reach any of the Investors' arguments about whether Spyglass properly removed any of the Investment Agreements from the Assumed Contracts Schedule, including whether it could do so after the sale closing.

Fourth, we also reject the Investors' judicial estoppel argument. The Investors point by analogy to the treatment of the Cohen Agreement, a work-made-for-hire contract between TWC and a producer (though not an Investment Agreement), as evidence that a non-executory Contract can still be an Assumed Contract. Specifically, they note that the Cohen Agreement was listed on the Assumed Contracts Schedule, later listed in the June 2018 Contract Notice as a non-executory Contract, then ultimately purchased pursuant to § 363 of the

_____

[4] None of this is meant to reward oversights in drafting the contract notices. However, because tens of thousands of contracts were at issue in this case, we are sympathetic to the reality that mistakes are inevitable. App. 2293, Bankr. Hr'g Tr. 58 (acknowledging that there was "confusion because the original list . . . may have included non-executory contracts").

11

Bankruptcy Code. The Investors insist that what is good for the goose must be good for the gander, so if Spyglass bought the Cohen Agreement, a non-executory Contract, by listing it on the Assumed Contracts Schedule, then that Schedule can be used to purchase the Investment Agreements too.

But this argument omits a critical fact—Spyglass indicated in the November 2018 Contract Notice that it believed it had already purchased the Cohen Agreement. App. 1484 n.3 ("The Purchaser [Spyglass] filed a declaratory action against one talent counterparty, Bruce Cohen, on October 17, 2018, seeking a determination that the contract between Cohen and The Weinstein Company is not executory and therefore was already assigned to the Purchaser pursuant to Bankruptcy Code section 363 [to repeat, the Code's sale section]."); *see also* App. 2295, Bankr. Hr'g Tr. 60 (noting that the Investment Agreements "are distinguishable from the Cohen contract[] . . . because the buyer designated the Cohen contract[] as one[] that the buyer bought under 363"). Here, Spyglass never indicated it wished to purchase the Investment Agreements under § 363. The only glimmer of that intent is the Assumed Contracts Schedule, a document filed early in the sale process that was over 2,000 pages long and listed tens of thousands of Contracts under a glaring disclaimer that the presence of any Contract on that list is not an admission it is executory. That Schedule is not enough for us to override the otherwise lucid language in the APA. Put differently, mistakenly listing non-executory Contracts on a behemoth schedule meant to include only executory Contracts hardly suffices as explicit intent to purchase them. And to be clear, it is possible for Spyglass to purchase a non-executory Contract as part of the § 363 sale, as it purported to do for the Cohen Agreement. But that purchase

12

is not accomplished by relying on "Assumed Contracts," a term limited to executory Contracts.

Having concluded the Investment Agreements are not Assumed Contracts, we turn next to the definition of "Excluded Liabilities" (*i.e.*, liabilities retained by TWC and not transferred to Spyglass), which includes "all liabilities arising under any Contract that is not an Assumed Contract." App. 845, APA § 2.4(f). This describes the Investment Agreements. Thus Spyglass did not assume any obligations under the Investment Agreements and is not required to turn over any of the Films' profits to the Investors.[5]

This result is not an accident but a feature of bankruptcy law. Where the nonbankrupt party has performed a contract but the debtor has not (in other words, the contract is not executory because there is no material obligation to be

---

[5] We do not need to resolve whether the Investment Agreements are also "Excluded Liabilities" because they are debt instruments. App. 500, APA § 2.4(c). Still, we think the District Court likely erred when it concluded the Investment Agreements are debt instruments. The Investors' right to payment is tied solely to the Films' performance, and they recover nothing if the Films do not generate profit. Indeed, many of the *Autostyle* factors our Circuit previously used to aid in the analysis weigh against the conclusion these Investment Agreements are debt instruments. *See In re HH Liquidation, LLC*, 590 B.R. 211, 292–96 (Bankr. D. Del. 2018); *see also In re Autostyle Plastics, Inc.*, 269 F.3d 726, 749–50 (6th Cir. 2001). For instance, the agreements are called "Investment Agreements" rather than loan or note agreements, most lack a fixed maturity date, and none has a set rate of interest.

13

performed by the non-debtor), "the estate could receive no benefit from" assuming the contract, so "it seems appropriate to simply bar the trustee from ever assuming such a contract." 3 Collier on Bankruptcy ¶ 365.02[2](a) (16th ed. 2020). In effect, the Bankruptcy Code views these non-executory contracts as liabilities for the debtor, unlike executory contracts whose value is uncertain and must be afforded the flexible assumption and rejection process set out in § 365. Of course, buyers can still voluntarily assume liabilities, including (as noted above) buying non-executory contracts as part of a § 363 sale, but they must clearly agree to do so. Here, we have no evidence of that clear agreement, nor do the Investors present any evidence that the assumption of these liabilities was ever negotiated with the Debtors or Spyglass. The Investors' arguments fail because the Bankruptcy Code anticipates that Spyglass would typically not want to buy these Investment Agreements and, indeed, nothing indicates otherwise.

IV.

The Investors raise additional arguments, but they are based on less plausible readings of the APA.

The Investors' first alternative argument is that the Investment Agreements are Purchased Assets because they are "Title Rights," which include "other contract rights with respect to each Covered Title." App. 917, APA Sch. 2.1(b); App. 1008, APA Ex. A-13. All the Films are Covered Titles, so the Investors assert that the Investment Agreements are Title Rights. This catch-all term, however, was meant to address valuable intellectual property and other rights in TWC's movies to ensure that Spyglass received the benefit of its bargain. By contrast, the Investment Agreements do not

14

contain any valuable rights in the Films. Ancillary contract rights in the Investment Agreements such as indemnification and confidentiality are about the contractual arrangement and not rights "with respect to" the Films. The only provision remotely approaching a Title Right is the Investors' opportunity to provide guidance regarding production, distribution, and marketing of the Films. But this is hardly a "right" for TWC, especially given all the Films were released years ago. The Investors did not retain any intellectual property in the Films, so they are stuck with the bargain they struck.

Second, we also reject the Investors' back-door argument that the Investment Agreements were purchased by Spyglass because they are not "Excluded Assets." As amended, the definition of Excluded Assets captures "all executory Contracts that are not Assumed Contracts." App. 844, APA § 2.2; App. 919, APA Sch. 2.2(h). The term "executory" was added in the Second Amendment. App. 1021. The Investors argue that assets under the APA are either "Purchased" or "Excluded," so if they are not Excluded, they must be Purchased. No doubt this provision is not the model of clarity, for the definition of "Excluded Assets" is silent on how to classify *non-executory* Contracts. But we do not need to adopt the Investors' reading. For one thing, the definition of "Excluded Liability," as noted above, states that Spyglass did not assume liabilities under Contracts that are not Assumed Contracts. That express provision supersedes the silent one. App. 844, APA § 2.4 ("*Notwithstanding any provision in this Agreement or any other writing to the contrary*, . . . Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of any Seller Party of whatever nature.") (emphasis added); *cf. Gerber v. Enter. Prods. Holdings, LLC*,

15

67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). Further, the Investors' argument defies logic. Under their view, Spyglass agreed in the APA, by default, to buy every non-executory Contract and assume their post-closing obligations. The APA and common sense do not require us to go so far.

Finally, the Investors argue that because the Films are Purchased Assets, and Spyglass assumed all liabilities "arising out of the operation of the Purchased Assets," App. 844, APA § 2.3, it also assumed obligations under the Investment Agreements. This argument fails because the Investment Agreements only provided funding for the Films and did not affect their operation, as the Investors had no hand in making or releasing the Films.

\* \* \* \* \*

Ultimately, the Investors' arguments amount to a "gotcha"—that Spyglass accidentally purchased the Investment Agreements due to a foot fault.[6] For us to conclude that it agreed to assume significant liabilities under non-executory contracts with no obvious benefit, we need clear language in the APA or an unambiguous indication of Spyglass's intent to do so. We have neither here, so we affirm

---

[6] Tellingly, the Investors did not try to clarify whether Spyglass bought the Investment Agreements until January 2019, nearly six months after the sale closed and two months after the November 2018 Contract Notice was filed. Oral Arg. Tr. 10:14–11:7.

the District Court's order affirming the Bankruptcy Court's ruling.