**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1372
_____

WELDING ENGINEERS LTD.,
                              Appellant

v.

NFM/WELDING ENGINEERS, INC.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2:16-cv-04850)
District Judge:  Honorable Nitza I. Quiñones Alejandro
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 19, 2022
_____

Before:  CHAGARES, <u>Chief Judge</u>, McKEE and PORTER, <u>Circuit Judges</u>

(Filed: October 13, 2022)
_____

OPINION[*]
_____

---

[*]  This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

**CHAGARES**, <u>Chief Judge</u>.

Appellant Welding Engineers Ltd. ("Welding") originally brought this breach of contract action against appellee NFM/Welding Engineers, Inc. ("NFM"). NFM counterclaimed for, <u>inter</u> <u>alia</u>, a declaratory judgment that it was entitled to design, manufacture, and sell hot isostatic pressing ("HIP") barrels notwithstanding a Technology Transfer Agreement between the parties. Following a bench trial, the District Court held that NFM was not restricted from making or selling HIP barrels in any field of use. For the reasons that follow, we will affirm the order of the District Court.

## I.

We write primarily for the parties and recite only the facts essential to our decision. Welding and NFM design, manufacture, and sell machinery and spare parts used to remove water during the production of synthetic rubber. Rubber is fed through an extruder, which comprises one or two large screws rotating inside a metallic barrel. Manufacturers employ various techniques to protect the barrel lining, including spin casting, liners, and HIP. Barrels made with different techniques are compatible with single or twin screw extruders. The barrels are spare parts that must be replaced every few years.

In 1998, Welding's parent company sold its counter-rotating, non-intermeshing ("CRNI") twin screw extruder technology to NFM, while retaining its single screw technology. Each granted the other a license to use its extruder technology. Following disputes over royalties, NFM filed suit in 2015. Welding and NFM settled the case by entering into the Technology Transfer Agreement ("TTA"), which is central to this appeal. Welding agreed to pay NFM $10,150,000 in exchange for (1) the release of

2

NFM's royalty claims under the 1988 agreement, and (2) acquiring exclusive rights to the "Purchased Technology." The TTA defines "Purchased Technology" as:

> [T]he entire right, title and interest of [NFM] in the Intellectual Property, including all Know-how, . . . , whether possessed or created by [either party], used in or associated with [CRNI] twin screw extruders used for the drying and removal of water from Butyl, Halobutyl and fluorinated rubber . . . , and any spare parts thereto, and further including any and all improvements thereto ("Field of Use") developed prior to the date of this Agreement . . . . Further, barrels manufactured with hot isostatic pressing (HIP) technology shall be excluded from the scope of "Purchased Technology."

TTA § 1.1.7 (emphasis added). The TTA prohibits NFM from "designing, manufacturing, marketing and/or selling equipment or services based on the Purchased Technology in the Field of Use, anywhere in the world." Id. § 5.1 (emphasis added). The field of use is the "removal of water from butyl, halobutyl and fluorinated rubber." Id. § 1.1.7.

The TTA also grants NFM a limited license-back permitting NFM to continue to supply spare parts to specific customers for five years. Id. § 4.1. If a customer requested a quote "for any twin screw extruders or spare parts related to Purchased Technology," the TTA requires NFM to "advise such customers that it is exiting the business relating to the Purchased Technology and in particular the business of selling spare parts used in equipment based on [CRNI] twin screw extruders" in the field of use. Id. § 4.3 (emphasis added).

Welding filed this action in 2016 for breach of contract following disagreements about technical drawings owed to it under the TTA. NFM filed seven counterclaims in response. Both parties cross-moved for summary judgment. The District Court granted summary judgment for Welding on its breach of contract claim and all but two of NFM's

3

counterclaims. One of NFM's two surviving counterclaims sought a declaratory judgment that NFM retained its rights to manufacture, market, and sell HIP barrels to any customer in any field of use. The District Court held that genuine issues of material fact as to "the type of HIP barrels sold, to whom, and for what purpose" precluded summary judgment on this claim. Appendix ("App.") 181–82.

The District Court held a three-day bench trial between November 20–22, 2019. The court permitted Welding to introduce extrinsic evidence regarding the parties' intent with respect to HIP barrels under the TTA. The District Court entered judgment for Welding in part and for NFM in part on January 26, 2021. The District Court held in relevant part that, under the TTA, "NFM is not restricted from developing or selling HIP Barrels in any field of use." App. 19. The court found that the "parties could not have been more precise" in defining Purchased Technology, which unambiguously excludes HIP barrels from its scope. App. 21. Because sections 5.1 and 4.3 incorporate Purchased Technology, the District Court held that neither provision limited NFM's ability to make or sell HIP barrels. Welding timely appealed the determination that NFM was not restricted from making or selling HIP barrels in any field of use.[1]

---

[1] The District Court also entered declaratory judgments that (1) NFM must continue to pay royalties for the sales of certain turbulators; and (2) that Welding is not restricted from developing or selling HIP Barrels, so long as Welding does not utilize NFM's HIP barrel technology. Welding does not appeal either of these decisions.

4

## II.[2]

Following a bench trial, "we review the District Court's factual findings, and mixed questions of law and fact, for clear error, and we review the Court's legal conclusions <u>de novo</u>." <u>Alpha Painting & Constr. Co. v. Del. River Port Auth. of Pa. & N.J.</u>, 853 F.3d 671, 682–83 (3d Cir. 2017). Contract construction is a question of law, while contract interpretation is a question of fact. <u>Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n</u>, 894 F.3d 509, 528 (3d Cir. 2018). If the contract is unambiguous, the issue is one of contract construction, which "requires determining the legal effect and consequences of contractual provisions." <u>Garden State Tanning Inc. v. Mitchell Mfg. Grp., Inc.</u>, 273 F.3d 332, 335 (3d Cir. 2001). If the contract is ambiguous, the issue is one of contract interpretation. <u>See</u> <u>Wayne Land</u>, 894 F.3d at 528.

## III.

Welding concedes that the definition of Purchased Technology excludes HIP barrels but nonetheless argues that the exclusivity provision under section 5.1 prohibits NFM from selling HIP barrels. Welding further argues that section 4.3 requires NFM to inform its customers that it is exiting the business of not only the Purchased Technology, but also HIP barrels. We analyze each argument in turn.

The "fundamental rule" of contract construction and interpretation under Pennsylvania law is to "ascertain and give effect to the intent of the contracting parties."

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1332(a) and 2201. This Court has jurisdiction under 28 U.S.C. § 1291.

Binswanger of Pa., Inc. v. TSG Real Est. LLC, 217 A.3d 256, 262 (Pa. 2019).[3]  We

regard the intent of the parties as "embodied in the writing itself" and consider the entire

agreement in determining intent.  Id.  When a writing is "clear and unequivocal," we

determine the contract's meaning only by its terms.  Id.

The District Court, relying upon these principles, concluded that the parties "could

not have been more precise" in excepting HIP barrels from the definition of Purchased

Technology.  App. 21.  We agree.  A contract is unambiguous if the language being

interpreted is susceptible to only one meaning.  See Emerson Radio Corp. v. Orion Sales,

Inc., 253 F.3d 159, 164 (3d Cir. 2001).  The parties included an express exception that

"barrels manufactured with hot isostatic pressing (HIP) technology shall be excluded

from the scope of 'Purchased Technology.'"  TTA § 1.1.7.  The definition of Purchased

Technology therefore supports only one reading:  that Purchased Technology includes

CRNI twin screw extruders and any spare parts thereto except HIP barrels within the field

of use.  Welding argues that parol evidence of the TTA's drafting history admitted at trial

demonstrates that the HIP-barrel exception was intended to apply only to NFM's

obligation to transfer technical records to Welding.  But because the term is clear and

unambiguous, we will not consider extrinsic evidence.  See Murphy v. Duquesne Univ.

of The Holy Ghost, 777 A.2d 418, 429 (Pa. 2001).  Whatever the parties' intent, the final

HIP-barrel exception was not a limited records exception.

---

[3] The TTA states, and the parties agree, that the contract is governed by and enforced in accordance with Pennsylvania law.  See TTA § 7.4.  We accordingly apply Pennsylvania law.

Having concluded that Purchased Technology does not include HIP barrels in any field of use, we must next determine whether sections 5.1 and 4.3, which incorporate Purchased Technology, also exclude HIP barrels. We consider each in turn.

A.

Section 5.1 is an exclusivity provision that prohibits NFM from "designing, manufacturing, marketing and/or selling equipment or services based on the Purchased Technology in the Field of Use . . . ." TTA § 5.1 (emphasis added). The District Court held that the "inclusion of the term Purchased Technology in the exclusivity provision [of section 5.1] limits the scope and applicability of the exclusivity provision itself." App. 23.

Welding argues that the use of "based on" expands the scope of section 5.1 beyond that which is included in the definition of Purchased Technology. Welding cites to a number of decisions that stand for the proposition that "based on" is necessarily not exclusive or equal to that which follows it. See, e.g., Norem v. Lincoln Benefit Life Co., 737 F.3d 1145, 1150 (7th Cir. 2013) ("[N]o one would suppose that a cake recipe 'based on' flour, sugar, and eggs must be limited *only* to those ingredients." (emphasis in original)). In this respect, Welding is correct. For example, section 5.1 prohibits NFM from providing services "based on" the Purchased Technology, but services are not mentioned in section 1.1.7. TTA § 1.1.7. The scope of the exclusivity provision therefore captures more than just Purchased Technology.

What it does not capture are HIP barrels. Welding argues that HIP barrels are "based on" CRNI extruders, which constitute Purchased Technology, and therefore are covered by the exclusivity provision of section 5.1, even if they are not included in the

7

definition of Purchased Technology. Welding notes that HIP barrels are specifically manufactured to fit CRNI twin screw extruders and therefore are necessarily "based on" Purchased Technology. That construction is untenable. Welding would have us read back into the exclusivity provision that which was expressly excluded from the definition of Purchased Technology. Where the defined term Purchased Technology is used, the HIP-barrel exception must also be incorporated, or, as the District Court explained, the exception for HIP barrels would be meaningless. See Sloan & Co. v. Liberty Mut. Ins. Co., 653 F.3d 175, 181 (3d Cir. 2011) ("[C]ourts should not interpret contracts in a way that renders at least one clause superfluous or meaningless." (quotation marks and alterations omitted)).

Accordingly, NFM is not prohibited from selling HIP barrels under section 5.1.

B.

Section 4.1 grants NFM a limited license to continue to supply specific customers with spare parts for five years. TTA § 4.1. NFM must advise these customers that it "is exiting the business relating to the Purchased Technology and in particular the business of selling spare parts used in equipment based on [CRNI] twin screw extruders" in the field of use when providing a quote "for any twin screw extruders or spare parts related to Purchased Technology." Id. § 4.3 (emphasis added). The District Court held that section 4.3 did not require NFM to inform its customers that it could no longer supply HIP barrels because the use of Purchased Technology meant that HIP barrels were excepted from NFM's obligations under section 4.3.

8

Welding argues that the "relating to" and "related to" language broadens the scope of section 4.3 beyond just Purchased Technology. There are two problems with this construction. First, as with section 5.1, Welding's construction renders the HIP-barrel exception in the definition of Purchased Technology largely meaningless. Second, section 4.3 is merely a notice provision that requires NFM to inform its customers of its limited rights to continue selling spare parts that fall within the Purchased Technology. Section 4.1 — the license-back for spare parts — grants NFM the right to use Purchased Technology to design, manufacture, and sell spare parts used for CRNI twin screw extruders in the field of use. TTA § 4.1. HIP barrels are spare parts that are excluded from the definition of Purchased Technology, and therefore they are likewise excluded from the license under section 4.1. Accordingly, section 4.3, which provides for notice of NFM's obligations under section 4.1, does not apply to HIP barrels. NFM's obligation is triggered in broad circumstances — it must inform any enumerated customer of its intent to exit the business relating to the Purchased Technology if the customer requests a quote for a twin screw extruder or "spare parts related to Purchased Technology." TTA § 4.3 (emphasis added). But that does not mean that it must inform customers that it will exit the business of selling spare parts that were specifically excluded from the Purchased Technology.

Welding cites a series of decisions for the proposition that "any," or "relating to," must be broadly construed. See, e.g., In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 366 (3d Cir. 2010) (broadly construing "any" as "wide reach[ing]"); Collins & Aikman Prod. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (characterizing a clause to

9

arbitrate "any claim or controversy arising out of or relating to" the agreement as "the paradigm of a broad clause"). The clause certainly is broad, and the use of "relating to" is not without meaning. NFM agreed to inform customers that it was "exiting the business relating to the Purchased Technology." TTA § 4.3. The most natural reading of "relating to" in this context is that NFM agrees to stop manufacturing, designing, selling, and servicing Purchased Technology, which are all aspects of "business" relating to the Purchased Technology. Similarly, NFM's obligation to inform customers that it is exiting "in particular the business of selling spare parts used in equipment based on [CRNI] twin screw extruders" most naturally means all aspects of that business.[4]

For the foregoing reasons, NFM is not prohibited from selling HIP barrels or required to inform customers of its intention to stop selling HIP barrels under section 4.3.

\* \* \* \* \*

---

[4] Welding argues that the District Court's construction of section 4.3 places it in in conflict with section 5.1. This argument relies on an assumption that section 5.1 prohibits NFM from selling HIP barrels. If neither section 4.3 nor 5.1 includes HIP barrels, then the sections are easily reconciled.

Welding separately argues that the District Court's construction of sections 4.3 and 5.1 produces absurd results. Welding proposes a hypothetical, applying the District Court's construction to a situation in which a client who is agnostic to the type of barrel contacts NFM to purchase a replacement barrel. Welding asserts that NFM would have to tell the customer that it is exiting the entire CRNI twin-extruder and spare parts business but that the client can "pretend" NFM has not made this statement and purchase a HIP barrel. Welding Br. 29. This, Welding argues, is an absurd result. But as NFM notes, the solution to this hypothetical is apparent. If a customer requests a barrel in the field of use, NFM can sell them a HIP barrel and only a HIP barrel. If the customer requests a CRNI twin screw extruder or any spare part other than a HIP barrel in the field of use, NFM may not provide the equipment.

10

The TTA makes clear that Welding did not acquire rights to NFM's HIP-barrel intellectual property.  Because sections 4.3 and 5.1 incorporate the term Purchased Technology, they also incorporate an exception for HIP barrels.  Welding therefore did not acquire rights to prevent NFM from making or selling HIP barrels.  The plain language of the TTA provides that HIP barrels are the only spare parts to CRNI twin screw extruders that NFM may continue to manufacture, design, and sell in the field of use.[5]

## III.

For the foregoing reasons, we will affirm the order of the District Court.

---

[5] We have considered Welding's other arguments not specifically addressed here and conclude that they are without merit.